[Crim. No. 22522. Dec. 23, 1982.]

In re DENNIS STANWORTH on Habeas Corpus.

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein, Karl S. Mayer and John Runde, Deputy Attorneys General, for Appellant.

Michael R. Snedeker and Smith & Snedeker for Respondent.

OPINION

RICHARDSON, J.—■ May a defendant who has been sentenced to a "life" imprisonment under the Indeterminate Sentence Law (ISL) (former Pen. Code, § 1168, repealed eff. Jan. 1, 1977) be entitled to parole release consideration under both ISL and the administrative guidelines which were in effect at the time he was sentenced and also under the Uniform Determinate

Sentencing Act of 1976 (DSL) (Pen. Code, § 1170 et seq.) and its implementing regulations? Concluding that ex post facto principles require that his right to parole be considered under both laws, we will affirm the trial court's grant of habeas corpus relief.

In 1966 defendant Dennis Stanworth was sentenced to death following his plea of guilty to two counts of first degree murder. He also pled guilty in the same proceeding to counts charging aggravated and simple kidnaping, forcible rape, oral copulation, and robbery. The convictions followed a series of crimes involving the brutal murders and abuse of multiple victims. After a jury trial on the issue of penalty, sentence was fixed at death on each of the murder counts and at life imprisonment without possibility of parole on the aggravated kidnaping count. We have reviewed defendant's case twice before. In *People* v. *Stanworth* (1969) 71 Cal.2d 820 [80 Cal.Rptr. 49, 457 P.2d 889], we reversed the death penalty which had been imposed because certain prospective jurors were excused for cause in violation of principles expressed by the United States Supreme Court in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. In 1974, following a second penalty trial, and imposition of a second death penalty, in *People* v. *Stanworth* (1974) 11 Cal.3d 588 [114 Cal.Rptr. 250, 522 P.2d 1058], we modified the death judgments to provide for "life imprisonment" on each murder count because of our intervening opinion in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], in which we held that the then California death penalty law was impermissibly cruel. We further reversed the count which charged kidnaping for the purpose of committing robbery with bodily harm. (See *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].)

Defendant was considered and rejected for parole release by the Adult Authority (Authority) in 1974, 1976, and 1977. Following the operative date of the DSL he was reconsidered and again rejected in 1977 and 1978. Finally, in 1979, the Community Release Board (successor to Authority and predecessor of the present Board of Prison Terms [hereinafter Board]) found defendant parole-ready. In reaching its decision, the Board stressed the following factors in defendant's personal history: (1) lack of prior serious criminal history or history of violent conduct; (2) institutional behavior, including cell study even while on death row, excellent work record, obtaining an associate of arts degree and a certificate in data processing, and six years of participation in therapy programs; (3) defendant's only disciplinary infraction occurred 10 years before while he was on death row; (4) no psychiatric contraindications (the reports of several psychotherapists who had worked closely with defendant in prison were uniformly laudatory); (5) realistic parole plans, including a $12,000 irrevocable educational trust fund set up in his behalf, and a personal $3,000 savings account.

When it found defendant parole-ready in 1979, the Board also fixed his term of imprisonment. It chose a 17-year term for the base offense of first degree murder. It added two years for the personal use of a firearm, and, for the other crimes to which defendant pleaded, the following enhancements: seven years for the second murder, three years for forcible rape, and eighteen months for oral copulation, aggregating a total term of thirty and one-half years. Defendant was then given credit for postconviction behavior at the rate of either two or three months' credit for each year spent on death row, and four months for each year after leaving death row, totalling forty-two months. Considering the postconviction and preprison credits, the board reached a total adjusted term of twenty-three years, four months and nine days.

Defendant administratively appealed the fixing of his parole date on the ground that it had been reached by mechanical computation rather than by individualized consideration and thus was inconsistent with the ISL sentencing scheme which was in effect at the time his crimes were committed. He argued that the DSL's focus on the nature of the crime and its goal of uniformity of punishment among those committing similar crimes conflicted, to his prejudice, with the emphasis on individual rehabilitation of the former ISL.

Administrative relief was denied, and defendant sought habeas corpus relief in superior court arguing that application of DSL parole standards to him and the Board's refusal to consider his parole status under ISL standards was a violation of the ex post facto clause of both the United States and California Constitutions. He also contended that, as to him, the equal protection clauses of both Constitutions were violated. This latter constitutional argument focuses on these two facts: under the Board's policy, ISL life termers for whom no parole date had been set prior to the effective date of the DSL received only one hearing pursuant to DSL guidelines; similar life termers who had obtained parole dates prior to the DSL effective date received a second hearing under DSL guidelines, and were given the benefit of the earlier of the two release dates.

In granting habeas corpus relief, the trial court held that defendant was entitled to a second parole hearing under the ISL guidelines on both ex post facto and equal protection grounds. The People appeal, arguing primarily that (1) defendant's rights to a parole-release date had not vested until he was adjudged suitable for parole, (2) the 1978 administrative guidelines under which his parole-release date was determined were not "laws," and (3) in any event, the newer guidelines were not more onerous than their predecessors, and therefore no ex post facto violation occurred. The People also argue that neither the new regulations nor their application deprived defendant of equal protection.

Resolving the issues before us on an ex post facto analysis alone, we need not examine defendant's other constitutional arguments.

States are prohibited from adopting ex post facto laws under the Constitutions of both the United States (art. I, § 10, cl. 1), and the State of California (art. I, § 9). The federal Constitution similarly constrains the United States Congress. (Art. I, § 9, cl. 3.) In a very early case (*Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386 [1 L.Ed.648]), Justice Chase, in the following manner, described those laws which were considered ex post facto: "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." (P. 390 [1 L.Ed. at p. 650].) Thus, from its earliest interpretation, the ex post facto clause has barred imposition of a punishment which, after commission of the crime, was increased or made more burdensome.

Recently, the United States Supreme Court analyzed the ex post facto clause within the context of a statute which altered the availability of "gain time for good conduct." (*Weaver* v. *Graham* (1981) 450 U.S. 24 [67 L.Ed.2d 17, 101 S.Ct. 960].) The Forida courts had denied Weaver habeas corpus relief on the ground that the allowance of such time " 'is an act of grace rather than a vested right and may be withdrawn, modified, or denied.' " (*Id.*, at p. 28 [67 L.Ed.2d at p. 22].) The high court corrected that interpretation, noting that ". . . our decisions prescribe that two critical elements be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it. [Citations.] Contrary to the reasoning of the Supreme Court of Florida, a law need not impair a 'vested right' to violate the *ex post facto* prohibition." (*Id.*, at p. 29 [67 L.Ed.2d at p. 23], fns. omitted.)

*Weaver* thus quickly disposes of the People's claim that because no parole date had been set before the change in guidelines defendant had no "vested right" to which the bar against ex post facto law attached. The high court responded to such an argument by saying: "The presence or absence of an affirmative, enforceable right is not relevant . . . . Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." (450 U.S. at p. 30 [67 L.Ed.2d at p. 24].) In brief, "The critical question is whether the law changes the legal consequences of acts completed before its effective date." (*Id.*, at p. 31 [67 L.Ed.2d at p. 24].) The Supreme Court concluded that it was unnecessary for it to decide whether the prospect of gain-time was technically part of the inmate's sentence in order "to conclude that it in fact is one determinant of petitioner's prison term—and that his effective sentence is altered once this determinant is changed." (*Id.*, at p. 32 [67 L.Ed.2d at p. 25].)

In definitive fashion, the high tribunal thus held that the alteration in the method of awarding gain time, even though the change authorized extra gain-time through exemplary conduct *at the discretion of the authorities,* constituted an impermissible ex post facto law as to the petitioner because it circumscribed his opportunities to gain early release and therefore made his punishment more onerous. (*Id.,* at p. 36 [67 L.Ed.2d at p. 27].) The tenor of *Weaver* seems unmistakable: prejudicial changes in punishment enacted after commission of a crime are suspect on ex post facto grounds.

Some additional light is cast upon the issue before us by the judicial treatment of recent changes in the Federal Parole Commission and Youth Corrections Act. In a pre-*Weaver* decision, the Ninth Circuit rejected an ex post facto claim and approved the application of changes in parole guidelines which placed greater emphasis on general rather than special deterrence factors. (*Rifai* v. *United States Parole Commission* (9th Cir. 1978) 586 F.2d 695; see also *Warren* v. *United States Parole Commission* (D.C. Cir. 1981) 659 F.2d 183, cert. den. (1982) 455 U.S. 950 [71 L.Ed.2d 665, 102 S.Ct. 1454].) However, other courts have found that a shift in the weight given to various factors in making parole determinations violated the ex post facto prohibition when applied to defendants convicted before enactment of the changes. (See *Welsh* v. *Mizell* (7th Cir. 1982) 668 F.2d 328, cert. den. (1982) — U.S. — [74 L.Ed.2d 186, 103 S.Ct. 235]; *Marshall* v. *Garrison* (4th Cir. 1981) 659 F.2d 440, 443; *DiNapoli* v. *United States Parole Commission* (M.D.Pa. 1982) 538 F.Supp. 658, 666-667.)

The Supreme Court has yet to rule directly on the ex post facto implications of amendments to federal penal law. However, the high tribunal's action in *Portley* v. *Grossman* (1981) 450 U.S. 962 [67 L.Ed.2d 611, 101 S.Ct. 1476], is instructive and arguably discredits the People's claim before us that ex post facto principles do not apply because the guidelines are not "laws." An initial in-chambers ruling in *Portley* (1980) 444 U.S. 1311 [62 L.Ed.2d 723, 100 S.Ct. 714], relied on *Dobbert* v. *Florida* (1977) 432 U.S. 282 [53 L.Ed.2d 344, 97 S.Ct. 2290], in which the high court had generalized that ex post facto laws did not " 'limit the legislative control of remedies and modes of procedure which do not affect matters of substance.' [432 U.S. at p. 293 (53 L.Ed. 2d at p. 356)]." In its later disposition of the appeal, however, the court as a whole reversed and remanded *Portley* for reconsideration in the light of its intervening *Weaver* decision. Thus, it is arguable that the Supreme Court considered the federal parole guideline changes, which are analogous to those before us, to be matters of substance rather than procedure.

Our conclusion that the change from ISL to DSL was more than procedural, thereby invoking ex post facto principles, is strengthened by the fact that the change in sentencing guidelines followed and reflected the change in the

underlying statutory scheme. In California, unlike the situation in *Rifai, supra,* 586 F.2d 695, the changed guidelines followed a substantial statutory revision. Under the ISL, we previously viewed parole thusly: "In the general field of criminal law the Legislature has abandoned the ancient notion of categorical punishment, the infliction of fixed terms for certain crimes, and substituted the indeterminate sentence, leaving to the Adult Authority the judgment of the period of incarceration. The Authority does not fix that period pursuant to a formula of punishment, but in accordance with the adjustment and social rehabilitation of the individual analyzed as a human composite of intellectual, emotional and genetic factors." (*People* v. *Morse* (1964) 60 Cal.2d 631, 642-643, fns. omitted [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].)

In contrast, by altering the statutory scheme and enacting the DSL, the Legislature recited specifically that it "finds and declares that the purpose of imprisonment for crime is punishment." (Pen. Code, § 1170, subd. (a)(1); all subsequent statutory references are to this code.) The new law provides that an inmate's "release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. *The board shall establish criteria for the setting of parole release dates* and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime." (§ 3041, subd. (a), italics added.) The present parole guidelines were promulgated pursuant to the new act. Thus, the guidelines are not mere administrative responses to the Board's internal shifting discretion but rather reflect basic legislative alterations in the underlying parole scheme. Viewing them so, we consider the laws and the regulations together in determining their ex post facto implications. (See *Welsh* v. *Mizell, supra,* 668 F.2d 328, 331.)

In applying ex post facto principles to the matter before us, we examine the effects of the DSL and regulations first reviewing the history of written parole guidelines and the statutory schemes from which they emanated.

When defendant was convicted in 1966, the Adult Authority exercised wide discretion in determining parole release dates. Few written guidelines, rules or decisions existed for reference. As we noted in *People* v. *Morse, supra,* 60 Cal.2d 631, under the ISL, parole release depended upon the individual characteristics of a particular inmate. Thus, we held that it was the duty of the Authority to consider individually each prisoner. It followed that if the Authority pursued a policy whereby it set at maximum the terms of all persons sentenced under the ISL for a particular crime, it was an abuse of the authority vested in it by the Legislature and did "*not* satisfy the requirements of individualized treatment and 'due consideration.' " (*In re Minnis* (1972) 7 Cal.3d 639, 647 [102

Cal.Rptr. 749, 498 P.2d 997]; see *In Re Rodriguez* (1975) 14 Cal.3d 639, 652 [122 Cal.Rptr. 552, 537 P.2d 384].) Although defendant here was not sentenced to an indeterminate sentence but to a determinate life sentence, nonetheless, parole considerations, philosophically, were the same for all inmates.

In *In re Stanley* (1976) 54 Cal.App.3d 1030 [126 Cal.Rptr. 524], the Court of Appeal reviewed two directives issued by the Authority in 1975 regarding parole standards and term-fixing. The *Stanley* court invalidated the term-fixing directive on the ground that it "gives primacy to the factor of prior criminality, leaving to silence and implication the factors of individual reclamation and post-release expectations. . . . It disregards the law's demand to weigh all, not part, of the relevant factors. [Citation.] Its reliance upon a table of time increments clashes with the statute's discerned demand for reasoned individualization." (P. 1040.)

Thereafter, in 1976, rules for the Authority and Women's Board of Terms and Parole were promulgated pursuant to the Administrative Code in former title 15. These rules represented the first and only published guidelines for parole under the ISL. While fully recognizing that these regulations were enacted after the commission of all of defendant's acts which resulted in his incarceration, we find that these regulations offer a convenient means by which to compare the implementation of parole standards under each statutory scheme. New parole regulations were enacted in 1978 following passage of the DSL, and detailed parole procedures are described in section 3040 et seq. As a life prisoner, defendant was not affected by the specific term-setting provisions of section 1170. As previously noted, section 3041, subdivision (a), requires that a parole-release date be set with an eye towards uniformity of sentencing as well as other considerations.

We briefly compare the salient features of the respective regulations under ISL and DSL. Both sets of regulations share certain common provisions. Under both the 1976 and the current rules, a life prisoner must first be found suitable for parole before a parole date is set. (Cal. Admin. Code, former tit. 15, §§ 2300-2301 [hereinafter, PBR]; Cal. Admin. Code, tit. 15, §§ 2280-2281 [hereinafter, BPT].) Either the current commitment offense or the offense deemed most serious by the parole panel in the event of multiple-commitment offenses is then selected as the base offense. (PBR, § 2351, subd. (b); BPT, § 2282, subd. (a).) The panel then sets "a base period of confinement," which under both systems is based solely on the gravity of the base offense. (PBR, § 2352; BPT, § 2282, subd. (a).)

The 1976 regulations provided that all the circumstances of the offense, including listed aggravating and mitigating circumstances, were to be considered

in setting the base period of confinement. (PBR, §§ 2200-2202.) The current rules similarly use aggravating and mitigating circumstances to determine whether the middle, upper or lower base term will be imposed. (BPT, §§ 2282, subd. (a), 2283-2284.)

Under the 1976 rules, suggested base ranges were established for each offense. The purpose of the ranges was twofold—to give the inmate and public an idea of the time to be served for a particular offense, and to serve "as general guidelines only which may be utilized by hearing panels as aids in determining an individual's actual base term or base period of confinement." (PBR, § 2225.) The range for first degree murder was set at 8 to 13 years.

Under current regulations, the base term "shall be established by utilizing the appropriate matrix of base terms . . . for the base offense . . . ." (BPT, § 2282, subd. (a).) "[I]f justified by the particular facts of the case," a term other than that provided in the matrix may be used. (*Ibid.*) The matrix for first degree murder provides four categories imposed on two separate axes. The "victims" axis considers the relationship of the victim and defendant and the "circumstances" axis focuses on the degree of involvement of the defendant and the nature of the murder. To select a base term the panel now looks at the combination of factors along both axes to find the appropriate range for the combination. The range for all first degree murders under this system is 8 to 22 years. In addition to the increased range of confinement in the newer rules, the language regarding the use of the matrix is more directory than that in the former rules, which specified the base ranges as "general guides only."

Under the ISL regulations, after a base term was selected, the panel was next directed to set a total period of confinement which consisted of the base period of confinement with adjustments. (PBR, § 2350-2351.) These adjustments were based on preconviction factors including criminal history (prior prison terms, felony convictions pled and proven, other convictions, lack of criminal history) and other personal factors such as the prisoner's "personal and social history, family and marital history, employment history, intelligence and education, skills already acquired and physical and emotional health." (PBR, § 2354, subd. (b).) The panel had discretion to increase confinement if there were multiple victims, and to consider the inmate's sentencing status based on the sentencing court's imposition of consecutive sentences or youthful offender sentences (PBR, § 2355). Relevant postconviction factors included prison offenses and any disciplinary offenses. (PBR, § 2356.) Finally, the panel was authorized to increase the total period of confinement for use or possession of a weapon. (PBR, § 2357.)

The new rules provide that "The terms set for the life crime, specific enhancements, and other crimes shall be added together resulting in a total life

term." (BPT, § 2289.) The panel is required to impose a two-year enhancement if the prisoner personally used a firearm in the commission of a life crime unless the panel expresses specific reasons for not imposing the added term. (BPT, § 2285.) Similarly, the panel must impose an enhancement, unless it specifically states reasons for not doing so, for multiple commitments (life sentences other than the base offense increase the term by seven years) and prior felony convictions. (The determinate enhancement for felony priors is used when there are prior prison terms; six months is added for felony convictions for which probation was granted.) In-custody disciplinary offenses may also be used to enhance. (BPT, § 2286, subds. (b)-(d).) The specified enhancements may be set higher or lower than the terms suggested in BPT section 2286 if enumerated aggravating or mitigating circumstances are present. (BPT, §§ 2287-2288.)

The enhancement adjustments under the two systems differ in that the newer scheme again is more directive. The earlier rules conferred on the panel discretionary authority to make adjustments, while the newer rules make certain enhancements mandatory unless the panel gives adequate reasons for not doing so. Moreover, the new provisions do not give adjustment consideration for factors such as the inmate's social and personal history as was authorized under PBR, section 2354, subdivision (b).

Also, there are differences between the two systems in the manner of computation of postconviction credits. Under ISL, progress hearings were held annually, at which time the panel was to consider "all relevant postconviction factors which do not factually relate to the commitment offense, but which may mitigate the punishment for the crime and must be considered in deciding when an inmate is ready for release on parole." (PBR, § 2392, subd. (a).) The panel was further instructed to look for "substantive changes" in the inmate relating to his ability to remain crime-free in the future, including: achievement of significant skills; significant improvement in self-control as demonstrated by good conduct, work habits and relationships; unusually good work performance; acceptance of new responsibilities; assistance in maintaining order; constructive use of leisure time; community support; unusual community service; cell study; voluntary work assignments; and significant participation and progress in psychiatric programs. (*Id.*, subd. (b).)

Under the present system, life prisoners are permitted to earn credits for each year in prison but generally such credit is limited to one-fourth of the term to be served with a maximum of four months per year. "Postconviction credit shall be granted to life prisoners in a manner which allows similar amounts of time to prisoners in similar circumstances." (BPT, § 2290, subd. (b).) Additional credit beyond that usually granted may be given "for work, program participation or other conduct that exceeds the general expectations set forth below and

the regulations of the Department of Corrections." (*Id.*, subd. (b)(2).) The criteria normally to be considered are limited to performance in work assignments, participation in self-help and rehabilitative programs, and institutional behavior. Unlike the previous system, the amount of credit presently allowed for postconviction behavior is limited unless there is exceptional conduct recognized by the panel. Moreover, the old system rewarded numerous factors which are not presently considered relevant.

We may summarize the differences between ISL and DSL rules by noting that the new regulations set a longer range of base terms for first degree murder and require the imposition of set additional terms for particular enhancements unless deviation from the norms is expressly justified. Moreover, the new rules generally reflect an attempt to achieve uniformity and stress the criminal activities of the inmate rather than any social or personal factors. We express no views concerning the comparative wisdom or propriety of one approach over the other. We simply ascertain whether the change in the philosophies and standards of punishment as evidenced by the alteration in regulations has affected defendant unconstitutionally by offending ex post facto principles.

In *Lindsey* v. *Washington* (1937) 301 U.S. 397 [81 L.Ed. 1182, 57 S.Ct. 797], the Supreme Court considered a Washington law whereby, at the time of the offense, a defendant's term could have been set at any period up to 15 years. At the time of sentencing, the law had been amended to provide for an indeterminate 15-year term. Finding that "The effect of the new statute is to make mandatory what was before only the maximum sentence" (p. 400 [81 L.Ed. at p. 1185]), the high court noted that "It is true that petitioners might have been sentenced to fifteen years under the old statute" (*id.*, at p. 401 [81 L.Ed. at pp. 1185-1186]). However, the court continued, "the *ex post facto* clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed. The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." (*Ibid.*)

The critical issue before us thus becomes not whether a change in the actual date of release has been effected, but whether the standards by which defendant's date of release is to be determined have been altered to his detriment.

The People suggest that, as applied to defendant, the new rules are not more onerous. Utilizing statistics compiled by the Department of Corrections for the years 1945 through 1978 showing the number of inmates paroled each year and the median and middle 80 percent range of the terms served by such persons, the People argue that the 228-month term imposed here for the base offense of first degree murder falls well within the median range of terms served by prisoners released under the ISL guidelines. From this premise the People then

urge that the seven-year term imposed for the second first degree murder conviction is at the low end of the median 80 percent range. Next, assuming that one-quarter good-time credit will be granted to defendant, the People argue that the DSL terms imposed are very short in comparison to previous ISL ones.

We cannot accept the People's argument because there is no indication that their statistics relate to terms served for first degree murder convictions alone without adjustments for other commitments or aggravating circumstances. Also, treating the second of the first degree murder counts as a separate increment of punishment is not analytically helpful. Because the precise basis for the People's computations are not offered, any comparisons are at best speculative.

Defendant's postconviction behavior was treated under DSL very differently from the manner contemplated under the 1976 regulations. It appears that the "standard of punishment" has substantially changed because postconviction behavior is no longer utilized in the same manner in determining his parole release date. We cannot predict with certainty the administrative effect on defendant of this change. In such a posture we are guided by the high tribunal's statement that "[t]he inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual." (*Weaver* v. *Graham, supra,* 450 U.S. at p. 33 [67 L.Ed.2d at p. 26].) This alteration in the law may well be to defendant's disadvantage because his postconviction behavior has been given different weight in the fixing of his term.

Finally, we note that there is implicit in the new DSL regulations, dealing with retroactivity, a difference in the standards for the award of postconviction credit under pre- and post-DSL treatment. Prisoners with release dates set under prior regulations retain that date and are also reviewed in accordance with the new regulations. They are to be released on the earlier of the two dates. With regard to the award of postconviction credits to such prisoners, the present regulations state "In determining the amount of postconviction credit appropriate for a prisoner's conduct during a specified period of time, the panel shall apply the guidelines under which the parole date was originally established. For example, a prisoner who had a parole date established under guidelines in effect prior to July 1, 1977, shall be considered for postconviction credit under the guidelines in effect prior to July 1, 1977. Any credit granted under those guidelines shall advance the parole date established under those guidelines." (BPT, § 2292, subd. (e).)

Thus, in its own regulations the Board has arguably conceded that the application of the new guidelines may result in a different award of postconviction credit from that applicable under the former standards.

From the foregoing, we conclude that the standard of punishment has been altered to defendant's prejudice in violation of ex post facto principles.

We do not suggest, in any manner, that defendant is entitled to an earlier release date, only that he is entitled to parole release consideration under both ISL and DSL standards. Defendant is entitled to a hearing and to the benefit of the earlier release date, if any, set pursuant to both standards.

We affirm the judgment of the trial court.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Caldecott, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.