[No. G006375. Fourth Dist., Div. Three. Nov. 14, 1988.]

In re ROGER J. MONIGOLD on Habeas Corpus.

COUNSEL

Robison D. Harley, Jr., under appointment by the Court of Appeal, for Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert B. Shaw and Keith I. Motley, Deputy Attorneys General, for Respondent.

**OPINION**

**CROSBY, J.**—Petitioner Roger Monigold is a state prison inmate serving an indeterminate term of 15 years to life for second degree murder, plus a determinate term of 2 years for use of a firearm. He seeks relief from the Board of Prison Terms' order recalculating and postponing his minimum eligible parole date (MEPD) when the board determined four years after the fact that he was ineligible for day-for-day worktime credit.

I

Monigold was sentenced in 1980, and his original MEPD was set in 1992. It was later reduced somewhat when the Court of Appeal held he was entitled to credit on the determinate enhancement as well as the indeterminate life sentence. (*In re Monigold* (1983) 139 Cal.App.3d 485 [188 Cal.Rptr. 698].) In January 1983, Penal Code section 2933[1] was enacted, allowing day-for-day worktime credits. The Department of Corrections advised Monigold of his eligibility for the program. He was already in a work program, and he signed a waiver form giving up his right to continue to be treated under a considerably less restrictive one-day-for-two-days conduct credit scheme in order to obtain day-for-day credit. Monigold's application was formally accepted by the department. His MEPD was recalculated accordingly, reflecting a cut of some 26 months; and his first parole hearing date was scheduled for 1988.

In April 1987, after accumulating one-for-one worktime credits for more than four years, Monigold was informed the department erred in allowing his participation in the worktime credit program. The Attorney General concluded in March 1987 that state prisoners serving indeterminate sen-

---

[1] Penal Code section 2933, subdivision (a) provides in part, "It is the intent of the Legislature that persons convicted of crime and sentenced to state prison, under Section 1170, serve the entire sentence imposed by the court, except for a reduction in the time served in the custody of the Director of Corrections for performance in work, training or education programs established by the Director of Corrections. Worktime credits shall apply for performance in work assignments and performance in elementary, high school, or vocational education programs. Enrollment in a two- or four-year college program leading to a degree shall result in the application of time credits equal to that provided in Section 2931. For every six months of full-time performance in a credit qualifying program, as designated by the director, a prisoner shall be awarded worktime credit reductions from his term of confinement of six months. . . ."

tences of 15 years to life, 25 years to life, or life with the possibility of parole are ineligible for worktime credits under Penal Code section 2933. (70 Ops.Cal.Atty.Gen. 49 (1987).)

The Attorney General's opinion required reversal of the department's earlier directive allowing petitioner and other "lifers" the opportunity to earn one-for-one worktime credits. After revocation of his earned worktime credits and recalculation of his MEPD with good behavior credits under Penal Code section 2933, Monigold's first parole hearing was rescheduled for 1990. His MEPD had been April 8, 1989; it is now June 6, 1991. We issued an order to show cause to review the merits of the Attorney General's opinion and to determine whether the state should be equitably estopped from reversing its earlier directive and recalculating Monigold's MEPD and rescheduling his first parole hearing.

## II

As the Attorney General's opinion explained, "In 1982 the Legislature substantially revised the system of credits to reduce prison sentences. (Statutes of 1982, ch. 1234.) Section 2930 and 2931 were amended to phase out the use of good behavior and participation credits not to exceed one-third the sentence by limiting its application to those whose crimes were committed prior to January 1, 1983. Section 2933 was added to provide 'worktime credits' for a prisoner's performance in work assignments and educational programs. The sentence is reduced one day for each day of such performance." (70 Ops.Cal.Atty.Gen. 49, *supra*.) **(1)** Section 2933, however, is expressly applicable only to those prisoners sentenced to determinate terms under Penal Code section 1170. (*Id.,* at p. 50.) It does not cover persons such as Monigold who are serving indeterminate terms and were not sentenced under Penal Code section 1170. (*Id.,* at p. 57.)[2]

The Attorney General's opinion is entitled to great weight (*Stockton Newspapers, Inc.* v. *Redevelopment Agency* (1985) 171 Cal.App.3d 95, 101, fn. 2 [214 Cal.Rptr. 561]), and we concur with his analysis. It is supported by the plain language of Penal Code section 2933: Monigold was not, and is not, eligible for worktime credits per that section. Monigold's argument that life prisoners are denied equal protection of the law is meritless (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549] [alleged impermissible "classification [must] affect[ ] two or more *similarly situated* groups in an unequal manner"]), as is his claim that he is somehow serving a determinate sentence. (*In re Quinn* (1945) 25 Cal.2d 799, 800-801 [154 P.2d 875].) Monigold raises several other contentions of the same sort in his

---

[2] Petitioner completed his two-year determinate term before the enactment of Penal Code section 2933.

traverse. Because they are beyond the scope of our order to show cause, we decline to address them.

## III

 Despite our agreement with the Attorney General's opinion that prisoners serving indeterminate sentences are not entitled to the benefits of Penal Code section 2933, we are concerned with the fairness of its retroactive application to petitioner, who participated in a worktime credit program for more than four years with the express understanding that such participation would guarantee an earlier MEPD and parole hearing. Consequently, we invited the parties to brief the question of whether the government ought to be equitably estopped from recalculating petitioner's MEPD and initial parole hearing date.

 The parties agree that three of the four elements of equitable estoppel are present:[3] The government was apprised of the facts; it intended petitioner to enter the worktime credit program when it was offered to him; and petitioner was ignorant of his ineligibility for that program. However, the Attorney General asserts petitioner cannot estop the state from revoking earned worktime credits because he did not rely upon its misrepresentations to his injury. (See generally *Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264]; *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 489.)

Thus, the sole question we must resolve is whether Monigold suffered a detriment in reliance on the work credits offered to him. The standard to be applied is the following: "Is the injustice which would result from a failure to raise an equitable estoppel against the [government] . . . of sufficient dimension to justify the effect upon public interest or policy which will result from the raising of such an estoppel?" (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at p. 499.) It is also the rule that "[e]stoppel will not ordinarily lie against a governmental agency if the result will be the frustration of a strong public policy. [Citations.]" (*Bib'le* v. *Committee of Bar Examiners* (1980) 26 Cal.3d 548, 553 [162 Cal.Rptr. 426, 606 P.2d 733].)

---

[3]For the first time in his petition for rehearing the Attorney General claims estoppel should not be applied because "the Department of Corrections was not apprised of the fact that inmates such as Monigold were ineligible to receive worktime credits." The contention makes no sense. As the Attorney General's own opinion correctly pointed out, that is the plain meaning of Penal Code section 2933. The department was apprised by the statute itself. Moreover, "knowledge of the true facts [may] *either* be possessed by the party to be estopped *or* be imputed to him in light of the circumstances. Especially in cases [such as Monigold's] where the party to be estopped has made affirmative representations, as opposed to mere silence or acquiescence, knowledge of the true facts will be imputed to one who, in the circumstances of the case, ought to have such knowledge. [Citations.]" *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 491, fns. omitted [91 Cal.Rptr. 23, 476 P.2d 423].)

Monigold contends several facts support his claim of injury and injustice. Most importantly, he complains recomputation of his MEPD delayed his initial hearing date and minimum potential parole date more than two years. The Attorney General replies those computations have little to do with petitioner's actual probable release date. He tells us that of the 54 inmates who improperly received early parole consideration under the erroneous interpretation of Penal Code section 2933, only 4 obtained parole dates at their respective hearings. And none was given a term which, after application of credits, would have caused release before the 10-year minimum release date for second degree murder. (Pen. Code, §§ 190, 2931.) In effect, the Attorney General contends petitioner cannot demonstrate he would be released earlier even if he were given the Penal Code section 2933 worktime credits. He is eligible for release at the discretion of the Board of Prison Terms, although his participation in the section 2933 program, with or without a guarantee of credits, will undoubtedly help him in his bid for parole.

Parenthetically, we note Monigold does not contend he would not have worked but for the promise of worktime credits. Indeed, he worked before enrolling in the Penal Code section 2933 program in 1983 in anticipation of one-for-two conduct credit and apparently continues to work. But the terms and conditions of the two programs are considerably different. In his traverse Monigold emphasizes this point: Specific rules which accompany the worktime program have caused him injury. For example, the Penal Code section 2933 program involves more rigid working hours and a requirement of full-time work, less time off for personal reasons, fewer opportunities to see visitors and make telephone calls, reduced canteen privileges, and a greater maximum credit loss in the event of a rule violation.

The Attorney General complains of the lateness of these factual assertions, disputes the accuracy of some, and downplays the importance of others. We believe alleged differences in the two credit programs were adequately raised in Monigold's original petition, but will not find it necessary to consider in any detail whether they alone demonstrate detriment sufficient to invoke the application of equitable estoppel.

In our view, the loss of an earlier MEPD and an earlier first parole hearing, without more, amounts to sufficient detriment when balanced against the competing potential harm to the public interest; and estoppel should be applied. We might possibly agree in other contexts that a showing of detrimental reliance comparable to what Monigold produced would be inadequate. But prisoner cases are somewhat unique: Of all persons, perhaps, society is less justified in breaking faith with those it has deprived of their freedom. We treat here with an incarcerated individual whose life

must be lived under demanding circumstances in precise conformance with the rules imposed upon him in the hope that he may someday be released.[4]

We hold Monigold is entitled to relief for the following reasons: First, and most obvious, who is to say that if the state's promise is kept, he will *not* be released earlier than he might otherwise under the current policy? The Attorney General's statistics do not demonstrate that could not happen; and even if they did, it would only prove the state has exactly zero demonstrable harm to offer in the equitable estoppel balancing process. Moreover, the Attorney General's claim that an earlier release is highly improbable, objectively examined, boils down to the cynical suggestion that our parole procedure, at least in the initial stages, is essentially a meaningless sham. We cannot lend judicial support to the notion, even if it is true as a practical matter.

The Attorney General also fails to recognize the potential damage to the morale of a prisoner in Monigold's position. The MEPD and the first parole hearing date are certainly of great importance to most prisoners, if only psychologically; and it must be of some comfort to an inmate that the parole process has at least begun, whether or not he should reasonably expect to obtain a parole date in the immediate future. Retroactive deferment of the first hearing date by some two years to this prisoner, who performed in good faith reliance on an interpretation of the Department of Corrections, essentially amounts to an indefensible and unwarranted additional punishment and *does* deny him equal protection vis-à-vis the fifty-four life inmates who have already participated in earlier parole hearings per Penal Code section 2933. It is of no moment that 50 of them did not receive parole dates and the 4 who did have had them rescinded as a result of the Attorney General's opinion. As explained below, the hearing itself is of some benefit to an inmate *even if* he does not receive a parole date.

Contrary to the Attorney General, we also find it significant that Monigold did run a greater risk of forfeiting credits under the more restrictive provisions of Penal Code section 2933 when he accepted the department's offer of that program. The Attorney General's answer, i.e., he was not harmed because he committed no violation and lost no benefits, is essentially beside the point. If that argument had merit, the army could renege on combat pay for soldiers who accepted the danger but avoided injury.

---

[4]"I know not whether Laws be right,
Or whether Laws be wrong;
All that we know who lie in gaol
Is that the wall is strong;
And that each day is like a year,
A year whose days are long." (Oscar Wilde, Ballad of Reading Gaol (1898).)

In addition, at the initial parole hearing the prisoner may not be given a release date; but he may be informed of correctable defects in his application, e.g., the suitability of his proposed living arrangement or employment after parole. With this assistance, he may improve his next presentation and succeed in obtaining a parole date sooner. Thus, if Monigold is destined to obtain a parole date only after two or more hearings, as the Attorney General argues, delaying the first of these by some two years could potentially postpone his eventual release by the same amount of time.

Indeed, as noted above in passing, the Attorney General's argument proves too much. If withdrawal of these earned benefits is so meaningless, why would the state oppose extending them to a prisoner who toiled four years in compliance with the rules as they were announced? Under the applicable standard, we are to balance the respective harms in deciding whether the state should be estopped. If there will be no cost to the state beyond the inconvenience of a useless hearing, Monigold surely has the better side of the argument; for allowing him the credit he has earned cannot possibly constitute "nullification of a strong rule of policy adopted for the benefit of the public. [Citation.]" (*Strong* v. *County of Santa Cruz, supra,* 15 Cal.3d at p. 725.)

It is of no consequence that Monigold might have worked anyway had he been correctly informed that Penal Code section 2933 did not apply to him. The department offered the benefits and burdens of that program, and he accepted both. Most people would presumably turn in a fugitive without the promise of a reward, but the reward must be paid without regard to mental state. The offeree need only perform according to the offeror's conditions. Speculation as to the offeree's state of mind, or likely behavior had the offer never been made, is beside the point.

For example, in *Crumpler* v. *Board of Administration* (1973) 32 Cal.App.3d 567 [108 Cal.Rptr. 293], animal control officers were originally classified as local safety members. Years later, the classification was determined to be erroneous. The Court of Appeal for this district held the mistake could be rectified prospectively, as here; but the retirement system was estopped from doing so retroactively. *Barrett* v. *Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593 [234 Cal.Rptr. 900], cited by the Attorney General, is not to the contrary. *Barrett* merely held that where certain sheriff's department employees had been erroneously classified as nonsafety officers, those officers could be required "to pay regular interest on their arrears contributions [to the retirement system] to obtain increased retirement benefits as safety members . . . ." (*Id.,* at p. 1612.) Monigold, of course, has already "paid"; no interest is required.

Finally, the idea that Monigold has failed to demonstrate detriment because he cannot prove he will be paroled any sooner if the state is required

to keep its promise is not persuasive for the same reason it is no defense to murder that the victim would have died someday anyway. For all we know, Monigold will never be released. But the department did not promise parole; it promised an earlier opportunity to be *considered* for a parole date. Dishonoring that commitment cannot be defended with the facile retort that the promisee failed to prove he *would have* been released sooner anymore than the state could renege on a promise to deliver a lottery ticket to a purchaser because the odds of winning are virtually nil. The buyer, like Monigold, is entitled to his ticket or at least a refund. His chances in the game itself are not even relevant. There is no way to provide a refund to Monigold short of giving him the credit the department erroneously told him he would earn, i.e., a MEPD and a parole hearing two years sooner than now planned.[5]

The petition for writ of habeas corpus is granted in part. The Board of Prison terms is directed to allow petitioner the worktime credits he accumulated during the period he was enrolled in the Penal Code section 2933 program until he was notified of his ineligibility and to recalculate his

---

[5] Since we originally filed our opinion we have received a petition for rehearing and had occasion to review *In re Thompson*▮ (Cal.App.); both assail our holding. The Attorney General argues, "By invoking the doctrine of equitable estoppel this [c]ourt has enlarged the power of the Department of Corrections in contravention of the clear meaning of the statute [Pen. Code, § 2933]." But our Sixth District colleagues reject the application of estoppel for virtually the opposite reason: "Further, what Corrections has given it can take away, and what it has taken away it can restore, under the broad discretion conferred by the regulations. At this point Thompson cannot claim with certainty that he will *not* ultimately be awarded one-for-one credits (or less, or more, as the regulation [Cal. Code Regs., tit. 15, § 2290] authorizes). He cannot say, like his DSL brother, that his term would have been x years, had not Corrections removed y credits. His term, by legislative fiat, is still indeterminate, and so also is the assignment of credits indefinite . . . until the release date be finally fixed." (*In re Thompson,*■ *supra* (Cal.App.).)

We strongly disagree with the *Thompson* court's implication that the Department of Corrections somehow enjoys arbitrary power over the credits to be awarded indeterminate prisoners, but the court is correct that the regulations *could* authorize day-for-day credit. This, of course, answers the Attorney General's claim that we have "enlarged the power of the Department of Corrections." (*In re Thompson,*■ *supra* (Cal.App.).)

The Attorney General and the *Thompson* court do manage to concur with our dissenting colleague that "the strong public interest behind indeterminate terms" (*In re Thompson,*■ *supra* (Cal.App.).) makes estoppel inappropriate. We still think that contention is meritless and unworthy of a just government. The public desires longer terms, perhaps; but there is no principled public policy which would support the denial of a mere hearing and an earlier MEPD after it had been earned by an inmate pursuant to a written agreement with the Department of Corrections. A society based on the rule of law cannot breach faith with its citizens, particularly with its weakest members, merely because the public clamors for ever more severe punishments. If it does, it is no longer worthy of the name.

MEPD and initial parole hearing date accordingly. In all other respects, the petition is denied.

Wallin, J., concurred.

**SCOVILLE, P. J.,** Concurring and Dissenting.—I concur in the majority's conclusion that petitioner is ineligible for worktime credits under Penal Code section 2933. (70 Ops.Cal.Atty.Gen. 49 (1987).) I dissent, however, from its application of equitable estoppel against the government.

The majority recognizes "[e]stoppel will not ordinarily lie against a governmental agency if the result will be the frustration of a strong public policy. [Citations.]" (*Bib'le* v. *Committee of Bar Examiners* (1980) 26 Cal.3d 548, 553 [162 Cal.Rptr. 426, 606 P.2d 733].) It then proceeds to ignore that test, never discussing the public policy interest at stake. The majority assumes the only cost to the state is "the inconvenience of a useless hearing." (*Ante,* p. 1230.) Not so. There is a strong public policy distinguishing prisoners sentenced to an indeterminate term from those serving determinate terms.

The Legislature's action enacting the Determinate Sentencing Law in 1977 "marked a change in the policy of imprisonment from rehabilitation to punishment. [Citations.]" (*In re Monigold* (1983) 139 Cal.App.3d 485, 490 [188 Cal.Rptr. 698].) Indeed, most prisoners now serve set terms, and their postconviction behavior has little if any effect on their release date. (See *In re Stanworth* (1982) 33 Cal.3d 176, 187 [187 Cal.Rptr. 783, 654 P.2d 1311].) Despite this shift in policy and adoption of determinate sentences for most crimes, the Legislature retained indeterminate sentences for the most heinous offenses, such as murder, petitioner's crime here.

Petitioner can be held for life, although he can be paroled when the Board of Prison Terms deems it appropriate. (Pen. Code, § 3041.) The parole decision is a discretionary one. The Legislature reserved the right to hold the most serious offenders for life despite recognition that punishment was more important than rehabilitation for most offenses. The retention of indeterminate sentences for the most serious offenders does not run contrary to that legislative purpose. It simply recognizes that more serious offenders perhaps ought to be punished for life. Rehabilitation in prison is only a secondary goal, affording parole to those life prisoners who demonstrate they have learned from their punishment.

The indeterminate hold on the more serious offenders fulfills an important public policy to punish them more severely and not promise release after a determinate term. It recognizes the need to force the more serious offenders to demonstrate their suitability to reenter mainstream society. Determinate prisoners will be released regardless, in a uniform system which places a "value" on the crime equal to the term of punishment

imposed. The Legislature has exempted the most serious offenders from this value system and enacted a policy of imprisonment for life absent demonstrable rehabilitation.

Awarding automatic worktime credits to reduce an indeterminate prisoner's term contradicts the very purpose of an indeterminate sentence. An indeterminate prisoner must demonstrate his suitability for release and should not be able to "buy" tokens which guarantee it. Moreover, "while the concept of a uniform system of conduct [and/or worktime] credits is a logical corollary of a determinate sentencing scheme, that concept makes no sense when there is no fixed term from which conduct credit can be subtracted." (*People* v. *Reynolds* (1981) 116 Cal.App.3d 141, 147 [171 Cal.Rptr. 461]; see also *People* v. *Saffell* (1979) 25 Cal.3d 223, 234 [157 Cal.Rptr. 897, 599 P.2d 92].)

Estoppel is inappropriate when one balances petitioner's claimed injury against the strong public policy behind indeterminate terms. All able-bodied prisoners are required to work (Pen. Code, § 2700) and petitioner apparently always has. He complains about more restrictive privileges mandated by the worktime credit program, which the Attorney General disputes. The claimed restrictions are hardly momentous, and certainly not punitive. (See *McQuillion* v. *Rushen* (N.D.Cal. 1986) 639 F.Supp. 420, 423.)

Similarly, the change in petitioner's parole suitability hearing and minimum eligible parole date do not justify abrogating the public policy behind indeterminate sentences. As explained in *In re Jackson* (1985) 39 Cal.3d 464 [216 Cal.Rptr. 760, 703 P.2d 100], "[a]t the initial parole suitability hearing, which occurs one year before an inmate's minimum eligible parole date ([Pen. Code,] § 3041), 90 percent of inmates are found unsuitable for parole release. At the second and subsequent parole suitability hearings, approximately 85 percent are found unsuitable. [Citations.]" (*Id.,* at p. 473.)

I recognize there is always a chance petitioner might have been in the minority, but that chance is remote and does not outweigh the public policy interest at stake. I therefore respectfully disagree with the majority's view we should give greater weight to petitioner's individual morale. The public policy interest is paramount. I conclude estoppel should not be applied against the government here because "the result [would] be the frustration of a strong public policy. [Citations.]" (*Bib'le* v. *Committee of Bar Examiners, supra,* 26 Cal.3d at p. 553.)

A petition for a rehearing was denied December 13, 1989, and the opinion was modified to read as printed above. Scoville, P. J., was of the opinion that the petition should be granted. Respondent's petition for review by the Supreme Court was denied February 16, 1989.