[Crim. No. 24381. Aug. 8, 1985.]

In re LAWRENCE A. JACKSON on Habeas Corpus.

**COUNSEL**

John K. Van de Kamp, Attorney General, Beverly K. Falk, Susan L. Frierson, Donald J. Oeser and Donald L. Roeschke, Deputy Attorneys General, for Appellant.

Rowan K. Klein, under appointment by the Supreme Court, and Richard Lennon for Respondent.

**OPINION**

**BIRD, C. J.**—Does the 1982 amendment to Penal Code section 3041.5,[1] which empowers the Board of Prison Terms to schedule parole suitability hearings biennially instead of annually, violate the ex post facto clauses of the state and federal Constitutions when applied to an inmate who committed his or her offense before its effective date?

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

## I.

Respondent, Lawrence Jackson, was convicted of first degree murder for a killing which occurred in September of 1961. He was sentenced to death. Following two penalty retrials, each resulting in a death sentence, respondent's sentence was ultimately fixed at life imprisonment, and the judgment, as modified, was affirmed. (*People* v. *Jackson* (1973) 10 Cal.3d 265, 269 [110 Cal.Rptr. 142, 514 P.2d 1222].)[2] At the time respondent committed the offense, California law did not require annual parole suitability hearings.

On July 1, 1977, the determinate sentencing law (DSL) went into effect. It provided that parole suitability hearings were to be conducted annually for prisoners for whom a parole date had not been set. (§ 3041.5, subd. (b)(2), as added by Stats. 1976, ch. 1139, § 281.8, p. 5152.) That provision was made applicable "to all prisoners serving sentence in the state prisons on July 1, 1977 . . . ." (§ 3065, as amended by Stats. 1977, ch. 2, § 7, p. 10.)

In 1982, the Legislature amended section 3041.5 to provide an exception to the annual parole suitability hearing requirement. The amendment permits the Board of Prison Terms (Board) to "schedule the next hearing no later than . . . two years after any hearing at which parole is denied if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding . . . ." (§ 3041.5, subd. (b)(2)(A), as amended by Stats. 1982, ch. 1435, § 1, p. 5474.)

Respondent appeared before the Board on February 17, 1983, for parole consideration. The Board found him unsuitable for parole and scheduled his next parole hearing two years later under the authority of the new amendment. The Board stated three reasons in support of its decision: (1) the crime was extremely brutal and senseless; (2) respondent had been convicted of two assaults prior to the murder; and (3) psychiatric evaluations were not supportive of release.

---

[2]After the initial judgment was affirmed (*People* v. *Jackson* (1963) 59 Cal.2d 375 [29 Cal.Rptr. 505, 379 P.2d 937]), the death sentence was reversed under the compulsion of *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]. (*In re Jackson* (1964) 61 Cal.2d 500 [39 Cal.Rptr. 220, 393 P.2d 420].) A new penalty trial resulted in a death sentence, which was subsequently reversed under the compulsion of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. (*People* v. *Jackson* (1967) 67 Cal.2d 96 [60 Cal.Rptr. 248, 429 P.2d 600].) The subsequent death sentence was reversed under the compulsion of *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]. (*People* v. *Jackson, supra,* 10 Cal.3d 265.)

In October 1983, after exhausting his administrative remedies (see *In re Dexter* (1979) 25 Cal.3d 921, 925 [160 Cal.Rptr. 118, 603 P.2d 35]), respondent sought habeas corpus in the superior court. He contended that the Board unlawfully postponed his next parole suitability hearing and did not give sufficient reasons for the postponement. The superior court granted the writ in part and found that the application of the 1982 amendment to Jackson violated the proscription against ex post facto laws. The court ordered that the Board provide him with annual parole consideration hearings. The People appeal this ruling.[3]

## II.

The parole consideration procedures are governed by section 3040 et seq. and apply to all inmates not serving a determinate sentence. (§ 1170 et seq.; see §§ 3041, 3000.) Once such an inmate has served sufficient time to be eligible or soon eligible for parole, he or she receives notice that a parole suitability hearing before a Board hearing panel will be held. (§§ 3041, 3041.5, 3042.) The inmate is afforded a variety of rights before and during the hearing. These include the right (1) to examine nonconfidential documents in the prison file and answer them in writing in advance of the hearing, (2) to reasonable assistance in preparing for the hearing, (3) to ask and answer questions and present evidence at the hearing, (4) to an impartial hearing panel, and (5) to receive a record of the proceedings and a copy of the hearing panel's written decision. Indigent prisoners serving life sentences are entitled to be represented by counsel provided at state expense. (§§ 3041.5, 3041.7, 3042; Cal. Admin. Code, tit. 15, §§ 2245-2256.)

Following the hearing, the Board must set a date for release on parole unless it determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." (§ 3041, subd. (b).) If the Board finds the inmate unsuitable for parole, the next hearing is normally scheduled for the following year. (§ 3041.5, subd. (b)(2).) However, if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the year following the denial of parole, the next hearing may be postponed for up to one year. The board must "state[] the bases" for

---

[3]While this case was pending in this court, it was learned that Mr. Jackson passed away. Therefore, the issues presented here are technically moot. However, since they are of public interest and are likely to recur, this court exercises its inherent discretion to guide the courts and the Board. (See *People* v. *Mancheno* (1982) 32 Cal.3d 855, fn. 1 [187 Cal.Rptr. 441, 654 P.2d 211]; *In re William M.* (1970) 3 Cal.3d 16, 23-25 [89 Cal.Rptr. 33, 473 P.2d 737]; *Sovereign* v. *People* (1983) 144 Cal.App.3d 143, 147 [192 Cal.Rptr. 469].)

the postponement. (§ 3041.5, subd. (b)(2)(A).)[4] It is this provision which is at issue here.

## III.

The state and federal Constitutions prohibit the legislative enactment of any ex post facto law. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) Whether a given law is within this prohibition depends upon the effect of the law. (*People* v. *Smith* (1983) 34 Cal.3d 251, 260 [193 Cal.Rptr. 692, 667 P.2d 149].) "[T]wo critical elements must be present for a criminal or penal law to be *ex post facto;* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." (*Weaver* v. *Graham* (1981) 450 U.S. 24, 29, fns. omitted [67 L.Ed.2d 17, 23, 101 S.Ct. 960].) ▮▮▮ It is undeniable that the 1982 amendment is being applied retrospectively, since it became operative more than 20 years after respondent's offense. The sole question presented, therefore, is whether the amendment disadvantages inmates in respondent's position.

The Attorney General has advanced three reasons why application of the postponement provision should be upheld. First, he argues that since respondent was not statutorily entitled to periodic parole review when he committed his offense, any subsequent reduction in the frequency of such review does not operate to his disadvantage. Next, he claims that since respondent possessed no "vested right" to parole, he has not been disadvantaged by elimination of mandatory annual review. Finally, he contends that the postponement provision is "procedural" and outside the ex post facto prohibition.

In 1961, when respondent committed the killing, there was no guarantee as to the frequency with which an inmate would be considered for parole. At that time, section 3041, the only statute applying to parole eligibility, provided simply that "[i]n any case the matter of parole may be determined by the Adult Authority at any time after the expiration of six months from and after the actual commencement of such imprisonment; provided, however, that where the maximum sentence is five years or less, such determination may be made by the Adult Authority after a period of 90 days." (Stats. 1957, ch. 2256, § 58, pp. 3934-3935.) Subsequently, case law im-

---

[4] A two-year postponement provision, also requiring a statement of reasons for its invocation, may be applied in the case of an indeterminately sentenced inmate who has been convicted of more than one offense involving the taking of a life. (§ 3041.5, subd. (b)(2)(B).) This provision was added by a 1981 amendment. (Stats. 1981, ch. 1111, § 4, pp. 4339-4340.) The one-year postponement provision applies to all other indeterminately sentenced inmates.

posed a requirement that an inmate's sentence be redetermined periodically. (See *In re Schoengarth* (1967) 66 Cal.2d 295, 302 [57 Cal.Rptr. 600, 425 P.2d 200], and cases cited.) By 1972, the Adult Authority had instituted a policy whereby "except in certain extreme cases where reconsideration of parole may be postponed for two or three years, the applications of all inmates should be reviewed at least annually." (*In re Minnis* (1972) 7 Cal.3d 639, 648 [102 Cal.Rptr. 749, 498 P.2d 997].)

With the enactment of the DSL, annual parole consideration was given to all indeterminately sentenced inmates, whatever the date of their crimes. (*Ante*, at p. 467.)[5] Thus, for ex post facto purposes, this case will be analyzed as if annual review were in effect at the time respondent committed his offense.

A few Courts of Appeal have reached similar conclusions in analogous contexts. *In re Bray* (1979) 97 Cal.App.3d 506 [158 Cal.Rptr. 745] is illustrative. There, a prisoner sentenced under the indeterminate sentencing law (ISL) was serving time for a parole violation when the DSL became effective. He was released from custody under the terms of the new law, which provided for a maximum of six months' imprisonment on a parole violation. (§ 3057, Stats. 1977, ch. 165, § 58, p. 669.) As he was about to be discharged from parole supervision after having served a combined maximum of 18 months on parole or in custody, the law was changed. This time, the parole period was increased to three years. When the Board applied the new amendment and failed to honor his discharge date, Bray sought habeas corpus relief.

The Court of Appeal granted the petition. It rejected the argument that the new amendment did not impose any more onerous a burden than the law in effect at the time of the offense. (*Bray, supra,* 97 Cal.App.3d at p. 514.) The court found it irrelevant that Bray's original ISL status gave him no right to an 18-month parole supervision or custody limit, since the Legislature "expressly conferred the benefits of the DSL on petitioner *and placed him in the position as if the DSL parole provisions were the law at the time he committed his offense.*" (*Id.*, at p. 517, italics added.)

Similar reasoning supported the Court of Appeal's holding in *In re Thomson* (1980) 104 Cal.App.3d 950 [164 Cal.Rptr. 99]. There, the court held that a three-year maximum parole period could not be imposed on an ISL inmate to whom the benefits of a one-year maximum parole period had been

---

[5]With the advent of determinate sentencing, individuals sentenced to determinate prison terms are no longer subject to Board determinations of suitability and release on parole. At the expiration of the determinate prison term, such individuals are automatically placed on parole for a fixed period. (See §§ 3000, 1170, subds. (c) & (e).)

made applicable by the DSL. "[O]nce the DSL has been applied to a prisoner, the benefits conferred cannot be retroactively taken away." (*Id.*, at p. 954.)[6]

Next, the Attorney General argues that the elimination of mandatory annual review does not violate ex post facto principles since respondent had no "vested right to parole." No protracted discussion is required. ■
As *Weaver* made clear, a law need not impair a vested right to violate the ex post facto prohibition. (*Weaver* v. *Graham, supra,* 450 U.S. at p. 29.) "The presence or absence of an affirmative, enforceable right is not relevant . . . to the *ex post facto* prohibition . . . ." (*Id.*, at p. 30 [67 L.Ed.2d at p. 24].)

■ Finally, the Attorney General avers that the 1982 amendment worked only a "procedural" change in respondent's rights. This contention is meritorious.

■ It is well established that "[c]hanges which may be designated as procedural do not, as a rule, come within the ex post facto doctrine . . . ." (*People* v. *Ward* (1958) 50 Cal.2d 702, 707 [328 P.2d 777, 76 A.L.R.2d 911], disapproved on other grounds in *People* v. *Morse, supra,* 60 Cal.2d at p. 649.) The United States Supreme Court recently reaffirmed this conclusion in *Weaver* v. *Graham, supra,* 450 U.S. 24, noting that "no *ex post facto* violation occurs if the change effected is merely procedural . . . ." (*Id.*, at p. 29, fn. 12; accord *Dobbert* v. *Florida* (1977) 432 U.S. 282, 293 [53 L.Ed.2d 344, 356, 97 S.Ct. 2290].) However, the classification of a change as substantive or procedural "in itself is not the true test" (*Ward, supra,* 50 Cal.2d at p. 707), since "[a]lteration of a substantial right . . . is not merely procedural, even if the statute takes a seemingly procedural form." (*Weaver, supra,* 450 U.S. at p. 29, fn. 12.) "[I]t is the effect, not the form, of the law that determines whether it is *ex post facto.*" (*Id.*, at p. 31 [67 L.Ed.2d at p. 24].)

---

[6]*People* v. *Benefield* (1977) 67 Cal.App.3d 51 [136 Cal.Rptr. 465], does not compel a contrary conclusion. There, a minor, tried as an adult, was sentenced to state prison for the commission of certain offenses. During his appeal, the sentencing statute was amended to provide that a minor tried as an adult could not be sentenced directly to state prison except upon the filing of a petition with the superior court. A later amendment, which also became effective during the appeal, removed the petition requirement, and provided that a minor could be sentenced to prison after a diagnostic evaluation by the Youth Authority. Both of these amendments were more beneficial than the law in effect at the time the offenses were committed, but the first amendment was more beneficial than the second.

The Court of Appeal rejected Benefield's contention that he was entitled to application of the earlier amendment. Relying on *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948], the court concluded that the Legislature intended only the later amendment to apply to cases not then final. (67 Cal.App.3d at p. 59.) In contrast, section 3065 expressly conferred the benefit of the DSL on respondent and others similarly situated, regardless of the date on which they committed their crimes.

To date, the high court has not undertaken to define which matters are "substantive" and which are "procedural." As the court explained some 60 years ago, "[j]ust what alterations of procedure will be held to be of sufficient moment to transgress the [ex post facto] prohibition cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree." (*Beazell* v. *Ohio* (1925) 269 U.S. 167, 171 [70 L.Ed. 216, 218, 46 S.Ct. 68].)

Similarly, this court has cautioned that "[e]ach new statute . . . must be individually weighed in the constitutional scales, in the context of a specific case, and the outcome will often depend on . . . how substantial is the right that the statute impairs and how significant is that impairment. Plainly these are questions on which reasonable judges may differ. Indeed, in close cases the decision will inevitably turn on such subtle factors as the court's sense of fair play and justice." (*People* v. *Smith, supra,* 34 Cal.3d at p. 260.)[7]

Although the issue is close, this court holds that the 1982 amendment is a procedural change outside the purview of the ex post facto clause.[8]

---

[7]This "case by case" approach has spawned numerous decisions identifying retroactively applied "procedural" changes as outside the purview of the ex post facto clause. Examples of these are: (1) a statute removing the disqualification of certain classes of people to serve as witnesses (*Hopt* v. *Utah* (1884) 110 U.S. 574 [28 L.Ed. 262, 4 S.Ct. 202]); (2) statutes permitting the admission of evidence which previously would have been excluded (*Thompson* v. *Missouri* (1898) 171 U.S. 380 [43 L.Ed. 204, 18 S.Ct. 922]; *People* v. *Ward, supra,* 50 Cal.2d at pp. 709-711); (3) a law depriving a codefendant of a previously existing right to a separate trial (*Beazell* v. *Ohio, supra,* 269 U.S. 167); (4) a statute giving the state the right to appeal where none existed previously (*Mallett* v. *North Carolina* (1901) 181 U.S. 589, 597 [45 L.Ed. 1015, 1020, 21 S.Ct. 730]); (5) a statute permitting opening and closing argument (*People* v. *Mortimer* (1873) 46 Cal. 114); (6) a constitutional provision permitting judicial comment on the evidence (*People* v. *Talkington* (1935) 8 Cal.App.2d 75, 81-83 [47 P.2d 368]); (7) a law changing the place of trial (*Gut* v. *The State* (1870) 76 U.S. (9 Wall.) 35 [19 L.Ed. 573]; (8) a statute substituting one form of execution for another (*Malloy* v. *South Carolina* (1915) 237 U.S. 180 [59 L.Ed. 905, 35 S.Ct. 507]); (9) laws which increase the statute of limitations period where the previous statute has not yet run (*People* v. *Sample* (1984) 161 Cal.App.3d 1053, 1057 [208 Cal.Rptr. 318] and cases there cited); (10) the repeal of a statutory right to appeal from a ruling in an extraordinary writ proceeding in the superior court brought to challenge an action of the municipal court (*Andrus* v. *Municipal Court* (1983) 143 Cal.App.3d 1041, 1048 [192 Cal.Rptr. 341]); (11) a statute lengthening the time of pronouncing judgment until the completion of probation proceedings (*People* v. *Williams* (1944) 24 Cal.2d 848, 849-850 [151 P.2d 244]); (12) a statute requiring 10 days' notice of a motion to suppress evidence (*People* v. *Berumen* (1969) 1 Cal.App.3d 471, 475 [81 Cal.Rptr. 757]); and (13) a statute permitting reinstatement of a criminal complaint which had been dismissed before the statute became effective (*Vlick* v. *Superior Court* (1982) 128 Cal.App.3d 992, 1000-1001 [180 Cal.Rptr. 742]). (See also examples and cases cited in *People* v. *Sobiek* (1973) 30 Cal.App.3d 458, 473 [106 Cal.Rptr. 519, 82 A.L.R.3d 804] and *People* v. *Smith, supra,* 34 Cal.3d at pp. 260, fn. 5, 261.)

This recitation is offered purely for illustrative purposes and in no way indicates this court's approval or disapproval of holdings not emanating from this court.

[8]The holding of *Morris* v. *Castro* (1985) 166 Cal.App.3d 33 [212 Cal.Rptr. 299], a case decided while this case was pending, is consistent with this conclusion.

The amendment did not alter the criteria by which parole suitability is determined. (Cf. *In re Duarte* (1983) 143 Cal.App.3d 943, 951 [193 Cal.Rptr. 176]; *In re Seabock* (1983) 140 Cal.App.3d 29, 40 [189 Cal.Rptr. 310] [rejecting an ex post facto claim that the DSL substantially altered parole suitability criteria].) Nor did it change the criteria governing an inmate's release on parole. (See *In re Stanworth* (1982) 33 Cal.3d 176, 187-188 [187 Cal.Rptr. 783, 654 P.2d 1311] [holding that since the DSL standards by which parole release is determined may violate ex post facto principles when applied to ISL inmates, ISL inmates are entitled to the more beneficial of ISL or DSL standards].) Most important, the amendment did not entirely deprive an inmate of the right to a parole suitability hearing. Such action would clearly have been contrary to this court's directive that "due consideration" be periodically given to whether to release an indeterminately sentenced inmate on parole. (*In re Minnis, supra,* 7 Cal.3d at p. 648.)

Instead, the 1982 amendment changed only the frequency with which the Board must give an inmate the opportunity to demonstrate parole suitability. (*Morris* v. *Castro, supra,* 166 Cal.App.3d at p. 39.) This change did eliminate the possibility that a parole date would be set within the period of the postponement. However, the likelihood that the postponement actually delays release on parole until after the next hearing appears slight.

The two legislative committee analyses which were prepared while the 1982 amendment was pending in the Legislature provide some insight on this point. At the initial parole suitability hearing, which occurs one year before an inmate's minimum eligible parole date (§ 3041), 90 percent of inmates are found unsuitable for parole release. At the second and subsequent parole suitability hearings, approximately 85 percent are found unsuitable. (Assem. Com. on Crim. Justice, Analysis of Assem. Bill No. 2832 (1981-1982 Reg. Sess.) p. 1; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2832 (1981-1982 Reg. Sess.) p. 5.) In view of these statistics, the 1982 amendment was seen as a means "to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released." (*Ibid.*)

The Board's experience must be considered in conjunction with the several procedural rights which inmates have at the hearing. (See *ante,* at p. 468.) These rights are in place to guard against arbitrary or erroneous decisions, and to ensure that the inmate receives "due consideration" of his or her present suitability for parole. (*In re Sturm* (1974) 11 Cal.3d 258, 268 [113 Cal.Rptr. 361, 521 P.2d 97].) Paramount among these are the right to reasonable assistance in preparing for the hearing, and in the case of life

prisoners, the right to counsel at the hearing.[9] (§ 3041.7; Cal. Admin. Code, tit. 15, §§ 2251, 2256.) Both rights provide an inmate with a meaningful opportunity to argue for a finding of suitability, and, failing that, against a postponement. Section 3041.5 also requires that any postponement of annual review be justified with a statement of reasons. Together, these guarantees act as insurance that any postponement decision be well-founded.

This case involves a finding of *unsuitability* for parole. Understandably, therefore, the record contains no evidence as to how often, if ever, a determination of parole *suitability* results in an inmate's *release* on parole soon after a suitability determination. Such evidence would obviously be relevant to whether inmates are actually disadvantaged—in terms of serving longer prison terms—as a result of a hearing postponement.

Although the Board's regulations make it theoretically possible for release to occur soon after a suitability finding,[10] information available to this court indicates that such a possibility may be more hypothetical than real. In recent months this court has received petitions from several ISL inmates who had been found suitable for parole and had release dates set. In these cases, the periods between the date of the suitability finding and the proposed release date vary from three and one-half to nineteen years. While concededly these cases do not constitute a statistically representative sample, the Board's action there does reinforce the conclusion that the "practical effect" of a hearing postponement is not significant. (See *Weaver* v. *Graham, supra,* 450 U.S. at p. 31; *People* v. *Smith, supra,* 34 Cal.3d at p. 260.)

---

[9]In *In re DeMond* (1985) 165 Cal.App.3d 932 [211 Cal.Rptr. 680], it was held that ISL inmates serving a life sentence are not entitled to counsel at hearings conducted to determine parole release under ISL criteria. It is helpful to understand why *DeMond* is inapposite here.

In *In re Stanworth, supra,* 33 Cal.3d 176, this court recognized the possibility that parole release criteria under the ISL may be more favorable than those under the DSL. Therefore, an ISL inmate is entitled to consideration under both ISL and DSL standards. (*Id.,* at p. 188.) *Stanworth* evidently resulted in new hearings at which ISL criteria were to be applied (now called "*Stanworth* hearings"). No statutory authority for counsel at such hearings exists. *DeMond* involved such a hearing.

On the other hand, the parole suitability hearing contemplated by section 3041.5 was accorded by the DSL. At that hearing, inmates serving a life sentence expressly have the right to be represented by counsel. (§ 3041.7.) Mr. DeMond had such a hearing before his "*Stanworth* hearing" and was represented by counsel. (*DeMond, supra,* 165 Cal.App.3d at p. 934.) As is evident, *DeMond* in no way undermines the right to counsel provision in suitability hearings.

[10]After the Board makes such a finding, it calculates a "total life term" by selecting a base term for the principal offense(s), adding any enhancements or other crimes, and reducing the sum by appropriate preprison credit. (Cal. Admin. Code, tit. 15, §§ 2282-2289.) If the time served by the inmate exceeds the "total life term," the inmate is released "upon time already served." (Cal. Admin. Code, tit. 15, § 2289.) If not, postconviction credit is awarded at the parole consideration hearing, and a parole date is set. (Cal. Admin. Code, tit. 15, § 2290.)

At oral argument, counsel for respondent urged that the 1982 amendment affects a substantial right because of the possibility that an inmate's suitability for parole might drastically improve during the period of the postponement. He suggested that a sudden change in an inmate's medical condition or recent cooperation with law enforcement may indicate suitability for parole in advance of the next regularly scheduled hearing. In such extraordinary cases, which on this record are merely hypothetical, it is conceivable that the Board could advance the suitability hearing and order immediate release. The fact that such possibilities exist does not undermine the conclusion that in general, it is unlikely that a postponement affects an inmate's right to an early parole release.

The several cases respondent relies on for his position are inapposite. In *Weaver* v. *Graham, supra,* 450 U.S. 24, the high court reviewed a Florida law which reduced the availability of postconviction "gain-time" credits available to inmates. In Weaver's case, the amendment lessened his opportunity for early release and effectively increased the punishment for an offense committed before the amendment became effective. (*Id.,* at pp. 33, 36 [67 L.Ed.2d at pp. 26-27].) Even if Weaver's institutional behavior remained constant, he was prevented from achieving a release date that he would have been entitled to under the old statute.

Here, however, inmates in respondent's situation were at no time assured that they would be found suitable for parole. There is no indication that an opportunity for an early release on parole has been affected by the new amendment.

*Rodriguez* v. *United States Parole Com'n.* (7th Cir. 1979) 594 F.2d 170 is similarly distinguishable. There, a federal inmate's maximum sentence was fixed at two years following perjury and fraud convictions arising out of conduct in 1974 and 1975. In early 1977, a Parole Commission regulation gave inmates like Rodriguez the right to a "meaningful parole review hearing" at the one-third point in their sentences. Later that year, the Parole Commission adopted another regulation which empowered the commission to schedule parole hearings as late as 18 months after the date of the previous hearing without regard to the one-third point in the inmate's sentence. (*Id.,* at p. 172.) Rodriguez had an initial parole hearing three months after commencing his sentence, but was refused a "one-third point hearing" under the authority of the new regulation. (*Id.,* at p. 171.)

The United States Court of Appeals held that retroactive application of the new regulation violated ex post facto principles. Given Rodriguez's two-year sentence and the fact that the next parole hearing would presumably not be scheduled until the 21st month of his confinement, the new regulation

had the effect of denying him "any meaningful opportunity for parole" before expiration of his maximum sentence. (*Id.*, at p. 176.)

The 1982 amendment did not eliminate ISL inmates' only "meaningful opportunity" for parole. They are secure in the guarantee that a parole suitability hearing will be held at least every two years and only when reasons are given for not scheduling annual review. Moreover, the provision eliminating mandatory annual review must be understood in the context of the life sentence which inmates affected by the new amendment potentially face. The amendment works far less of a disadvantage there than in the case of an inmate facing a maximum sentence of a few years. In short, since the 1982 amendment does not deny inmates their "only practical opportunity for parole" (*id.*, at p. 173), *Rodriguez* is inapposite.

Equally inapposite is *Love* v. *Fitzharris* (9th Cir. 1972) 460 F.2d 382, vacated on other grounds (1973) 409 U.S. 1100 [34 L.Ed.2d 682, 93 S.Ct. 896]. There, the Department of Corrections informed a California inmate that he would be eligible for parole in three years and four months. Shortly thereafter, the department recalculated Love's minimum parole eligibility at five years. The court of appeals held the recalculation was invalid under ex post facto principles, reasoning that "eligibility for parole consideration . . . is part of the 'law annexed to the crime when committed.' " (*Id.*, at p. 384.)[11]

Here, it is not an ISL inmate's minimum parole eligibility which is at issue. Nothing in the postponement provision or in the entire parole suitability hearing process has altered the period within which such an inmate becomes eligible for parole. Here, the Board determined that it was not reasonable to expect that parole would be granted during the year following the 1983 hearing. That determination did not affect respondent's *eligibility* for early release, but only the *frequency* of parole suitability hearings. The effect on parole release was not nearly as significant as it was in *Love* or *Griffin*.

For all of these reasons, this court holds that an inmate's opportunity for release on parole is not significantly impaired by application of the new

---

[11]*In re Griffin* (1963) 63 Cal.2d 757 [48 Cal.Rptr. 183, 408 P.2d 969], upon which respondent also relies, is similar to *Love*. While charges were pending in Griffin's marijuana sales case, the Legislature amended the parole eligibility statute to increase the minimum time an inmate was required to serve before becoming eligible for parole. This court held that "when considered realistically and as a whole, the amendatory statute increased the punishment, and so cannot be made applicable to [Griffin]." (*Id.*, at p. 761.) Since Griffin had already been released on parole by the time of the court's decision, a contrary holding would have required the Department of Corrections to take him back into custody. (*Id.*, at p. 760.)

amendment. ■ ■■■ Accordingly, the statutory change permitting such a postponement does not violate ex post facto principles. (See *People v. Smith, supra,* 34 Cal.3d at p. 260.)[12]

## IV.

■ One additional issue, also of general importance, must be addressed. It concerns whether the Board failed to adequately "state[] the bases for the finding" that it was not reasonable to expect that parole would be granted at a hearing during the following year. (§ 3041.5, subd. (b)(2)(A).)

The requirement of a statement of reasons furthers several laudable state interests. A statement of reasons permits litigants the opportunity to intelligently decide whether to seek administrative and/or judicial review of the Board's decision and ensures that such review will be meaningful. If habeas corpus relief is sought to correct an allegedly unlawful postponement, a prisoner must allege with particularity circumstances constituting the Board's unlawful action. (*In re Swain* (1949) 34 Cal.2d 300 [209 P.2d 793].) It is unlikely that an inmate seeking relief from a postponement "can make necessary allegations with the requisite specificity unless he has some knowledge of the reasons therefor." (*In re Sturm, supra,* 11 Cal.3d at p. 269 [requiring statement of reasons for denying parole].)

In addition, a statement of reasons acts as a safeguard against a careless decision to postpone review, ensuring that the Board has some basis for its decision. Such a statement also "aid[s] in preserving public confidence in the decision-making process 'by helping to persuade the parties [and the public] that . . . decision-making is careful, reasoned and equitable.'" (*In re Podesto* (1976) 15 Cal.3d 921, 937 [127 Cal.Rptr. 97, 544 P.2d 1297] [holding that trial courts should render a brief statement of reasons in support of an order denying a motion for bail on appeal].)

As originally enacted, section 3041.5 contained a requirement that the Board "send the prisoner a written statement setting forth the reason or reasons for refusal to set a parole date . . . ." (Stats. 1976, ch. 1139, § 281.8, p. 5152.) The 1981 and 1982 amendments reenacted this language and added provisions permitting exceptions to annual parole suitability review if accompanied by a statement of reasons. (Stats. 1981, ch. 1111, § 4, pp. 4339-4340; Stats. 1982, ch. 1435, § 1, p. 5474.)

---

[12]Obviously, the opportunity to be heard is an important right. Restrictions on that right may have significant consequences. For this reason, not every retrospective encroachment on the right to annual review will pass muster under ex post facto principles as "merely procedural." Each such case must be determined on its own facts. (*Beazell* v. *Ohio, supra,* 269 U.S. at p. 171; *People* v. *Smith, supra,* 34 Cal.3d at p. 260.)

If the Legislature had intended a single statement of reasons to suffice for both the refusal to set a parole date and the decision to postpone annual review, it would not have enacted language specifically calling for a statement of reasons on the latter. For this court to permit a single statement to serve both purposes would in essence render the 1981 and 1982 amendments meaningless, a conclusion which the rules of statutory construction do not allow. (*Brown* v. *Superior Court* (1984) 37 Cal.3d 477, 484 [208 Cal.Rptr. 724, 691 P.2d 272]; *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658-659 [147 Cal.Rptr. 359, 580 P.2d 1155].) Accordingly, this court holds the Board to the legislative requirement that its reasons for postponing a suitability hearing be separately stated and specifically directed to that question.

The Attorney General argues that it is not rational to require two separate statements since such a requirement is "virtually impossible" to comply with. In his view, "[b]oth the decision to deny parole and to delay a subsequent hearing for two years must be the same."

This argument ignores the distinction which the parole statutes make. A finding that an inmate is unsuitable for parole requires the Board to find that "consideration of the public safety requires a more lengthy period of incarceration . . . ." (§ 3041, subd. (b).) The postponement provision, on the other hand, requires a finding that "it is not reasonable to expect that parole would be granted at a hearing during the following year . . . ." (§ 3041.5, subd. (b).) The first determination attempts to predict the risk to the public safety, while the second attempts to predict that the risk is likely to continue for at least as long as the period of the postponement. Although they are related, they are not identical.

Support for the holding that a separate statement of reasons is required lies in the analogous decision in *People* v. *Lock* (1981) 30 Cal.3d 454 [179 Cal.Rptr. 56, 637 P.2d 292]. There, this court invalidated a mentally disordered sex offender's (MDSO) prison commitment on the ground that the trial court failed to indicate why Lock would not have benefited from treatment in a state hospital or other mental facility. Relying on statutory and rule authority which require a trial court to articulate reasons in support of any "sentence choice"—one such choice being the commitment of an MDSO to a mental facility—this court held that the statement of reasons was "either deficient or indicative of an erroneous view of the consequences of an MDSO commitment." (*Id.,* at p. 460.)

*Lock* is instructive because it upheld the duty of trial courts to conform a statement of reasons to the precise purpose for which it is required. Just as the decision not to hospitalize an MDSO must be accompanied by reasons

why he or she will not benefit from a mental health commitment, the decision to postpone a parole suitability hearing must be supported by reasons directed to why the postponement is appropriate.

The conclusion that a separate statement of reasons is required also finds support in *People* v. *Belmontes* (1983) 34 Cal.3d 335 [193 Cal.Rptr. 882, 667 P.2d 686]. In *Belmontes,* this court unanimously held that a trial court's decision to impose a fully consecutive term for a sex offense conviction is a "sentencing choice" requiring a statement of reasons separate from the statement required "merely to sentence consecutively." (*Id.*, at p. 347.) "In deciding whether to sentence consecutively or concurrently, and if consecutively, whether to do so under section 1170.1 or under the harsher full term provisions of subdivision (c) of section 667.6, the court is obviously making separate and distinct decisions." (*Ibid.*) Today's reaffirmation of the letter and spirit of section 3041.5 is fully consistent with this reasoning.

This holding does not mean that the reasons for refusing to set a parole date must necessarily be completely different from the reasons for excepting an inmate's case from annual review. The latter decision involves a prediction that at least during the period of the postponement, an inmate will not likely become suitable for parole. That prediction may involve some of the same facts on which the unsuitability determination is based. What is required, however, is an identification of reasons which justify the postponement. To paraphrase Justice Kaus in *Belmontes,* "[t]he crucial factor . . . is that the record reflect recognition . . . that [the Board] is making a separate and additional choice . . . ." (34 Cal.3d at p. 348.)[13]

In this case, the Board's written decision contains a single statement of reasons in support of the unsuitability finding and the postponement. This was insufficient for there is no indication that the two questions were considered separately. After setting forth the legal requirements for unsuitability and postponement findings, the Board stated that respondent "meets the criteria for a two year denial." The Board then concluded that "[t]he panel arrived at said findings of unsuitability and two year denial by reason of the following," and proceeded to recite three reasons. (See *ante,* at p. 467.) These conclusory statements failed to comply with the intent of section

---

[13]It appears that to a limited extent the Board has already recognized this point. The administrative directive which discusses the statement of reasons requirement gives a laundry list of suggested reasons for a two-year postponement. (Bd. of Prison Terms, Admin. Directive 83/5 (Sept. 1, 1983).) Although these reasons parallel those which the regulations specify may be used in finding an inmate serving a life sentence unsuitable for parole (see Cal. Admin. Code, tit. 15, § 2281, subd. (c)), some are directed to postponement rather than suitability. So that there will be no question in the future, the Board would be well-advised to conform any future directives to the views expressed in this opinion.

3041.5, since it is virtually impossible to know the precise factors which led the Board to postpone annual review.

## V.

The Board's application of the parole suitability hearing postponement provisions of section 3041.5 to respondent did not violate the ex post facto clauses of the state or federal Constitutions. The Board is required, however, to support all such postponement determinations with a separate statement of reasons, as section 3041.5, subdivision (b) requires.

The court having received and filed a certified copy of a certificate evidencing the death of respondent Lawrence Jackson during the pendency of this appeal, all proceedings in the cause have permanently abated. The superior court is directed to enter its order to that effect. (See *People* v. *Dail* (1943) 22 Cal.2d 642, 659 [140 P.2d 828]; *People* v. *de St. Maurice* (1913) 166 Cal. 201, 202 [135 P. 952].)

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

Respondent's petition for a rehearing was denied September 19, 1985.