**Charles Denton WATSON,
Petitioner–Appellee,**

v.

**Wayne ESTELLE,
Respondent–Appellant.**

**No. 87–6599.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1988.

Decided Oct. 6, 1988.

Carol Slater Frederick, Deputy Atty. Gen. of State of Cal., Los Angeles, Cal., for respondent-appellant.

Donald Specter, Prison Law Office, San Quentin, Cal., for petitioner-appellee.

Before GOODWIN and HALL, Circuit Judges, and MARQUEZ,* District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Respondent-appellant Wayne Estelle, Warden ("Estelle"), appeals the judgment granting a writ of habeas corpus to petitioner-appellee Charles Denton Watson ("Watson"). The district court had jurisdiction pursuant to 28 U.S.C. § 2254. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 & 2253, and we affirm.

---

* Honorable Alfredo C. Marquez, United States District Judge for the District of Arizona, sitting    by designation.

### I

In 1971, Watson was convicted of seven counts of murder and one count of conspiracy to commit murder for his participation in the Tate–LaBianca murders as part of the Manson family. His death sentence was modified to life imprisonment when the California Supreme Court invalidated the death penalty.

In 1977, California's Determinate Sentencing Law ("DSL") became effective. As enacted, the DSL contained a provision obligating the Board of Prison Terms ("Board") to conduct annual parole hearings for all indeterminately sentenced prisoners, such as Watson.[1] This provision was retroactive, putting Watson in the same position he would have occupied "if annual review were in effect at the time [he] committed his offense." *In re Jackson*, 39 Cal.3d 464, 470, 216 Cal.Rptr. 760, 763, 703 P.2d 100, 103 (1985). In 1982, California amended the DSL to create "an exception to the annual parole suitability hearing requirement." *Id.* at 467, 216 Cal. Rptr. at 761, 703 P.2d at 101. This exception authorizes the Board to wait up to three years (rather than one year) between parole hearings for inmates convicted of more than one "offense which involves the taking of a life." Cal. Penal Code § 3041.5(b)(2)(B). A subsequent amendment also permits a two year interval between hearings as to any prisoner without regard to the offense. Cal. Penal Code § 3041.5(b)(2)(A). In either case, the Board may delay the parole hearings only if it "finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding." These changes have been codified at subsection 3041.-5(b)(2) of the California Penal Code. (For convenience, we will refer to clauses 3041.-5(b)(2)(A) & (B) as "subsection 3041.-5(b)(2)," even though that subsection con-

tains other operative language not relevant to this appeal.)

In 1983, the Board delayed Watson's parole hearings for the maximum three year period authorized by subsection 3041.-5(b)(2). In response, Watson sought a writ of habeas corpus in state court. The state trial court granted the writ on ex post facto grounds and was affirmed by the California Court of Appeal. The California Supreme Court then decided *Jackson*, which rejected an ex post facto clause challenge to subsection 3041.5(b)(2). Upon reconsideration in light of *Jackson*, the California Court of Appeal reversed the trial court's decision to grant the writ. The state supreme court declined review.

Having exhausted his state remedies, Watson filed the present habeas petition in the district court. The district court adopted the magistrate's recommendations and entered judgment granting the petition and issuing the writ. The writ does not order Watson's release, but instead orders the Board to hold annual parole hearings. From this judgment, Estelle appeals.

### II

■ We review a district court's decision to grant or deny a petition for a writ of habeas corpus de novo, but review the magistrate's findings of fact and their adoption by the district court for clear error. *Carter v. McCarthy*, 806 F.2d 1373, 1375 (9th Cir.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 198, 98 L.Ed.2d 149 (1987).

This appeal is governed by *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), in which the Supreme Court held that "two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it," *id.* at 29, 101 S.Ct. at 964 (footnotes omitted). This appeal raises only the second prong of *Weaver*,[2]

---

**1.** Before then, "case law imposed a requirement that an inmate's sentence be redetermined periodically." *In re Jackson*, 39 Cal.3d 464, 470–470, 216 Cal.Rptr. 760, 763, 703 P.2d 100, 101 (1985).

**2.** Estelle appears to have abandoned two other points he pursued before the district court.

First, Estelle argued that Watson "has no constitutionally protected interest based on his hope that he will be granted parole." This argument lacks merit; numerous cases establish that

inquiring whether Watson has been "disadvantaged" within the meaning of the ex post facto clause.

This prong is satisfied if the reduction in the frequency of parole hearings "makes more burdensome the punishment for [the] crime." *Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925). In contrast, "no *ex post facto* violation occurs if a change does not alter 'substantial personal rights,' but merely changes 'modes of procedure which do not affect matters of substance.'" *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (citations omitted). Ultimately, the inquiry hinges on whether the challenged law increases "the quantum of punishment attached to the crime," *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977).[3] "The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937).

■ The case law, however, fails to provide specific guidelines governing the inquiry into whether the new law "worsens conditions imposed by its predecessor," *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966, in violation of the ex post facto clause. *See Dobbert,* 432 U.S. at 292, 97 S.Ct. at 2298 ("Our cases have not attempted to precisely delimit the scope of [the phrase 'ex post facto'], but have instead given it substance by an accretion of case law."). Nevertheless, the recent cases indicate that in determining whether a new penal law makes a sentence more burdensome the ex post facto clause requires us to take a realistic view focusing on the expectations of the prisoner. More specifically, it seems that the cases are highly skeptical of the constitutionality of alterations of penal laws that adversely affect the potential duration of actual physical incarceration, either at sentencing or by making it more difficult for prisoners to earn early release.

prisoners have an interest protected by the ex post facto clause in programs holding out the possibility of reductions in the duration of their incarceration. *See, e.g., Weaver,* 450 U.S. at 25–27, 101 S.Ct. at 962–63 (program granting reduced sentence for good behavior), 32 (citing cases); *Chatman v. Marquez,* 754 F.2d 1531, 1535 (9th Cir.) (ex post facto principles apply to parole qualification issues), *cert. denied,* 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 101 (1985); *see also, e.g., Warden v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383 (1974) ("a repealer of parole eligibility ... would clearly present [a] serious question under the *ex post facto* clause"). This interest need not rise to the level of a "vested right" protected by the due process clause, *see Weaver,* 450 U.S. at 29–30 & n. 13, 101 S.Ct. at 464–65 & n. 13 although recent Supreme Court cases indicate that the interests created by the DSL are sufficient to invoke due process protections, *see Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

Second, apparently attacking the retrospectivity prong of *Weaver,* Estelle argued that Watson's "punishment is not greater than prescribed at the time of the crime/sentence." Even though California enacted the DSL after Watson's crime and conviction, the California Supreme Court has interpreted the law to "'place [Watson] in the position as if the DSL parole provisions were the law at the time he commit-

ted his offense.'" *Jackson,* 39 Cal.3d at 471, 216 Cal.Rptr. at 763, 703 P.2d at 103 (emphasis omitted) (citation omitted). California's interpretation of the DSL binds this court. *See Lindsey v. Washington,* 301 U.S. 397, 400, 57 S.Ct. 797, 798, 81 L.Ed. 1182 (1937). Thus, subsection 3041.-5(b)(2) is squarely within the *Weaver* definition of retrospectivity: it "appl[ies] to events occurring before its enactment," 450 U.S. at 29, 101 S.Ct. at 964.

3. The distinction between "procedure" and "substance" is a commentary on the basic inquiry rather than a separate doctrine. A retrospective law that is procedural in form must not adversely affect "matters of substance" if it is to survive an ex post facto challenge. The Supreme Court summarized this point cogently in *Weaver,* stating:

> [N]o *ex post facto* violation occurs if the change effected is merely procedural, and does "not increase the punishment nor [sic] change the ingredients of the offense or the ultimate facts necessary to establish guilt." Alteration of a substantial right, however, is not merely procedural, even if the statute takes a seemingly procedural form.

450 U.S. at 29 n. 12, 101 S.Ct. 964 n. 12 (citations omitted); *accord* 450 U.S. at 31 n. 15, 101 S.Ct. at 965 n. 15; *Beazell,* 269 U.S. at 170–71, 46 S.Ct. at 69; *cf. Miller,* 107 S.Ct. at 2452–53 (performing procedural inquiry, but noting that "the distinction between substance and procedure might sometimes prove elusive").

*Weaver*, which involved "gain time credits," is the most analogous of the recent Supreme Court cases. There, existing law had provided for reductions of the sentences of prisoners for good conduct. The amount of the reduction, or "gain time credit," was determined according to a statutory formula. Although the statute provided for additional discretionary gain time, prisoners whose conduct conformed to the statutory requirements earned a specific amount of gain time spelled out by the formula. *Weaver* arose when the state replaced the formula with a less generous method of calculating gain time and attempted to apply it retroactively to prisoners who had earned gain time under the old formula.

Without dissent, the Supreme Court prohibited the application of the new method to prisoners who had earned gain time pursuant to the old formula. The six-Justice opinion of the Court evinces a broad approach that seeks to assess the prisoner's expectations realistically rather than to apply technical doctrinal requirements. *See* 450 U.S. at 32–34, 101 S.Ct. at 966–67. For example, the Court thought it relevant that "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *See id.* at 32, 101 S.Ct. at 966. The Court also quoted an earlier case that "found 'no distinction between depriving a prisoner of the right to earn good conduct deductions and the right to qualify for, and hence earn, parole. Each ... materially "alters the situation of the accused to his disadvantage." ' " *Id.* at 34, 101 S.Ct. at 967 (citations omitted). The two concurrences, although unfavorably disposed toward the ex post facto challenge, acknowledged (one explicitly, one tacitly) that the Court's realistic approach mandated a holding that the new statute was more onerous than the old.

*Rodriguez v. United States Parole Commission*, 594 F.2d 170 (7th Cir.1979), is in line with *Weaver* and involved facts closely analogous to those presented here. The petitioner in *Rodriguez* was convicted and sentenced in early 1977 for crimes committed in 1974 and 1975. Rodriguez had been sentenced to a maximum term of two years in prison under a statute that made him immediately eligible for parole. At the time Rodriguez committed his crimes, the parole regulations required that the parole board hold a parole hearing for prisoners sentenced under that statute at the one-third point of their sentence, in addition to a much earlier, initial hearing at which few prisoners were ever granted parole. After Rodriguez committed his crimes, the parole regulation was revised, eliminating the one-third hearing requirement and replacing it with one that preserved the initial hearing and called for additional review hearings to be held not less frequently than 18 months after the initial hearing. The Seventh Circuit held that the ex post facto clause prohibited the Parole Commission from applying the new law to Rodriguez.

Estelle seeks to distinguish *Rodriguez*, arguing that the Seventh Circuit upheld the ex post facto challenge "not simply because [the new regulation] changed the frequency of parole hearings, but because in the case of prisoners with short sentences like Rodriguez the regulation denied them *all* opportunity for release on parole prior to the expiration of their maximum sentence."

We do not find Estelle's attempt to distinguish *Rodriguez* persuasive. The Seventh Circuit did declare unconstitutional the "[d]enial of any meaningful opportunity for parole by retroactive application of the Parole Commission's rule." 594 F.2d at 176. But the underlying reason for the court's holding was that "[e]ligibility [for parole] in the abstract is useless; only an unusual prisoner could be expected to think that he is not suffering a penalty when even though he is eligible for parole and might be released if granted a hearing, he is denied that hearing." *Id.* This passage indicates that the *Rodriguez* court sought to protect the prisoner's expectation of a hearing at which he could establish his eligibility for parole release. That the specific alteration at issue in *Rodriguez* eliminated all meaningful opportunity for parole was incidental; the key was the deprivation

of an opportunity that existed prior to the revision of the regulatory scheme. *See also id.* at 175 (deprivation of opportunity to receive shorter sentence violated ex post facto clause even though prisoner retained opportunity for parole; a fortiori, elimination of all opportunity for parole raised ex post facto issue).

Guided by the case law, we now consider whether subsection 3041.5(b)(2) effects a detriment or material disadvantage against any expectations of Watson protected by the ex post facto clause. The California Supreme Court has noted that subsection 3041.5(b)(2) "changed only the frequency with which the Board must give an inmate the opportunity to demonstrate parole suitability." *Jackson,* 39 Cal.3d at 473, 216 Cal.Rptr. at 765, 703 P.2d at 105.[4] Prior to the enactment of subsection 3041.5(b)(2), California law required the Board to hold annual suitability hearings. Cal. Penal Code § 3041(b). Subsection 3041.5(b)(2), however, permits delays of up to three years between suitability hearings. By authorizing the Board to deny a prisoner the opportunity to establish his eligibility for parole for a longer period than was allowed by prior law, subsection 3041.5(b)(2) effects a "detriment or material disadvantage" against prisoners who were given annual parole hearings under pre-subsection 3041.5(b)(2) law. We therefore hold that subsection 3041.5(b)(2) violates the ex post facto clause as applied to Watson.

Additionally, subsection 3041.5(b)(2) permits the Board to frustrate a prisoner's interest in obtaining a parole release date for three times as long as was permitted by prior law. Pre-subsection 3041.5(b)(2) law provided that a prisoner had a right to parole that could only be denied by the Board if supported by certain findings made after a suitability hearing. *See* Cal. Penal Code § 3041(b) (the Board "shall set a release date unless" it makes certain determinations); *see also Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (similar Montana statute creates "liberty interest in parole release" protected by due process, relying on *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (Nebraska statute)). Under subsection 3041.5(b)(2), the Board may prevent the prisoner from securing a release date for three years rather than one. "This change did eliminate the possibility that a parole date would be set within the period of the postponement." *Jackson,* 39 Cal.3d at 473, 216 Cal.Rptr. at 765, 703 P.2d at 105. This change also constitutes a "detriment or material disadvantage" for ex post facto purposes and provides an independent basis for our holding.

Finally, subsection 3041.5(b)(2) allows the Board to deny release on a standard different from the existing suitability standard. In the words of the California Supreme Court:

**4.** The *Jackson* court went on to reject the ex post facto challenge because "the likelihood that the postponement actually delays release on parole until after the next hearing appears slight." 39 Cal.3d at 473–75, 216 Cal.Rptr. at 765–66, 703 P.2d at 105–07. The court noted that a relatively low percentage of prisoners were actually granted parole and that in practice prisoners were released "from three and one-half to nineteen years" after they were found suitable. Thus, the court reasoned that prisoners were not "actually disadvantaged" by the new postponement provisions.

The California court employed a fundamentally flawed approach when it adopted such factually contingent reasoning. The Supreme Court has stated on numerous occasions that "[t]he [ex post facto] inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual," *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966, *see, e.g., Miller,* 107 S.Ct. at 2452, *Lindsey,* 301 U.S. at 401, 57 S.Ct. at 799, a view this court has followed, *see Chatman,* 754 F.2d at 1535. The California court erred by examining the Board's informal practice instead of restricting its review to the Board's statutory authority. *See Lindsey,* 301 U.S. at 400–01, 57 S.Ct. at 798–99; *see also Miller,* 107 S.Ct. at 2452 (change in sentencing guidelines increasing recommended sentence, even without a change in range of sentences permitted by statute, violates ex post facto clause); *Dobbert,* 432 U.S. at 300, 97 S.Ct. at 2302 (*Lindsey* "mean[s] that one is not barred from challenging a change in the penal code on *ex post facto* grounds simply because the sentence he received under the new law was not more onerous than that which he might have received under the old").

A finding that an inmate is unsuitable for parole requires the Board to find that "consideration of the public safety requires a more lengthy period of incarceration...." The postponement provision, on the other hand, requires a finding that "it is not reasonable to expect that parole would be granted at a hearing during the following year...." The first determination attempts to predict the risk to the public safety, while the second attempts to predict that the risk is likely to continue for at least as long as the period of the postponement. Although they are related, they are not identical.

*Jackson,* 39 Cal.3d at 478, 216 Cal.Rptr. at 769, 703 P.2d at 109. Under prior law, the Board could only deny parole on the basis of an assessment of current risk. Postsubsection 3041.5(b)(2) law retains the "current risk" standard and also allows the Board to deny parole on the basis of a prediction that the risk will continue into the future. This, too, constitutes a "detriment or material disadvantage" in violation of the ex post facto clause.

### III

We add that by our decision today we do not mean to imply that we believe Watson should be released on parole. We do not. That issue is not before us, but is for the Board to decide. Instead, we only affirm the district court judgment ordering the Board to review Watson's eligibility for parole on an annual basis. Like the Seventh Circuit in *Rodriguez,* we believe that the ex post facto clause of the Constitution compels our decision. The State of California gave its prisoners an expectation of annual parole review pursuant to a specified standard. The state may not now retrospectively take that expectation away. For three separate reasons, each of which provides an independent basis for our decision, we hold that as applied to Watson the changes effected by subsection 3041.5(b)(2) constitute detriments or material disadvantages in violation of the ex post facto clause.

AFFIRMED.