United States Court of Appeals,

Eleventh Circuit.

No. 97-9009.

Robert L. JONES, Plaintiff-Appellant,

v.

J. Wayne GARNER, Employed as Chairman, State Board of Pardons and Paroles, et al.,
Defendants-Appellees.

Jan. 6, 1999.

Appeal from the United States District Court for the Northern District of Georgia.  (No. 1:95-cv-3012-CAM), Charles A. Moy, Jr., Judge.

Before BIRCH and BARKETT, Circuit Judges, and HANCOCK*, Senior District Judge.

BARKETT, Circuit Judge:

Robert Jones appeals the district court's order granting summary judgment to defendants J. Wayne Garner and other former and current members of the Georgia Board of Pardons and Paroles ("the Board") on Jones' claim that the retroactive application of amendments to the Georgia regulations governing parole consideration, Ga. Comp. R. & Regs. r. 475-3-.05.(2) (1986), violated the Ex Post Facto Clause of Article I, § 10 of the United States Constitution.  In *Akins v. Snow,* 922 F.2d 1558 (11th Cir.1991), we held that retroactive application of r. 475-3-.05(2) violated this clause's prohibition on ex post facto laws.  After the Supreme Court decided *California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), in which it held that the retroactive application of a legislative amendment to the California parole regulations that decreased the frequency of parole suitability hearings in certain circumstances did not represent an

*Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

ex post facto violation, the Board concluded that *Akins* had been overruled and scheduled Jones' next hearing for 2003 pursuant to the rule promulgated in 1986. The district court agreed that *Morales* overruled *Akins,* and granted summary judgment to the defendants. We find that *Morales* reinforced our holding in *Akins,* and pursuant to *Morales* and *Akins,* we REVERSE.

I. Background

The facts of this case are not in dispute. In July 1974, Jones was sentenced in the Superior Court of Fulton County, Georgia, to life in prison for murder. In August of 1982 he was again sentenced in the same court to life in prison for murder on subsequent charges. At the time of Jones' second offense, the state regulations governing parole consideration required that he first be considered for parole after seven years and, if parole was not granted at that time, that he be considered every three years thereafter. After Jones was incarcerated but before he was initially considered for parole, the Board amended its rules to require that parole reconsideration take place only once every eight years. *See* Ga. Comp. R. & Regs. r. 475-3-.05.(2).[1]

Jones was initially considered for parole in 1989, seven years after his 1982 conviction, and parole was denied. At that time, rather than scheduling Jones for a rehearing after three years as provided for by the Board rules at the time of the offense, the Board scheduled Jones for reconsideration eight years later, in 1997. In the meantime, however, this Court decided *Akins v. Snow,* 922 F.2d 1558 (11th Cir.1991), in which it held that the retroactive application of r. 475-3-

---

[1]As amended, the regulation relating to frequency of parole reconsideration reads as follows:

> Reconsideration of those inmates serving life sentences who have been denied parole shall take place at least every eight years. The Board will inform inmates denied parole of the reasons for such denial without disclosing confidential sources of information or possible discouraging diagnostic opinions.

Ga. Comp. R. & Regs. r. 475-3-.05.(2).

.05.(2) violated the Ex Post Facto Clause of Article I, § 10 of the United States Constitution. As a result, Jones was reconsidered for parole in three year intervals, in 1992 and again in 1995. In 1995, however, the Supreme Court decided *California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). The Board read *Morales* to overrule *Akins,* and as a consequence, rather than scheduling Jones' next consideration for 1998, the Board scheduled Jones for reconsideration in 2003 (eight years later).

In 1995, following the Board's rescheduling of his next parole reconsideration for 2003, Jones filed a *pro se* § 1983 action in the Northern District of Georgia, alleging that the Board's action violated several of his constitutional rights. The district court dismissed his complaint as frivolous on all counts. Jones appealed the dismissal, and a panel of this Court reversed in part, finding Jones's allegation of an Ex Post Facto Clause violation not to be frivolous. On remand, both parties filed motions for summary judgment. The district court granted defendant's motion for summary judgment and denied Jones' motion on the ground that *Morales* had overruled *Akins.* Jones now appeals.

II. Discussion

The Constitution provides that "[n]o State shall ... pass any ... ex post facto Law...." U.S. Const. art. I, § 10, cl. 1. At the time of the drafting of the Constitution, the phrase " "ex post facto law' was a term of art with a well-established meaning." *Akins v. Snow,* 922 F.2d at 1560. In *Calder v. Bull,* 3 U.S. (Dall.) 386, 1 L.Ed. 648 (1798), the Supreme Court "identified several legislative acts that clearly implicated the core concerns" with respect to ex post facto laws that existed at the time the Constitution was written. *Akins,* 922 F.2d at 1560-61. Included in such legislative acts was any law "... that *changes the punishment,* and *inflicts a greater punishment,* than the law annexed to the crime, when committed." *Akins,* 922 F.2d at 1560-61 (quoting *Calder,* 3 U.S. (Dall.) at 390

(emphasis in original)).  The Supreme Court's ex post facto rulings have continued to adhere to the original principle that laws with this effect violate the Constitution's ex post facto prohibition.  *See id.* (collecting cases).[2]

*Akins v. Snow*

In *Akins,* this Court considered an ex post facto challenge to the retroactive application of the amendments to Georgia's regulations governing parole consideration at issue here, *see* Ga. Comp. R. & Regs. r. 475-3-.05.(2), and held such application to violate the proscription against laws " "that *change[ ] the punishment,* and *inflict[ ] a greater punishment* than the law annexed to the crime when committed.' "  *Akins,* 922 F.2d at 1560-61 (quoting *Calder,* 3 U.S. (Dall.) at 390 (emphasis in original)).  When the crimes for which the petitioners in *Akins* were convicted were committed, "the Board's rules required the Board to initially consider an inmate serving a life term for parole after serving seven years of his life sentence." *Id.* at 1560.  If the inmate was denied parole at that time, he would receive reconsideration every year thereafter.  *See id.*  The regulation was subsequently amended so that "[parole r]econsideration of those inmates serving life sentences who have been denied parole shall take place at least every eight years."  Ga. Comp. R. & Regs. r. 475-3-.05.(2).  Applying the two-pronged test for Ex Post Facto Clause violations established by the Supreme Court in *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981),[3] we

---

[2]*Miller v. Florida,* 482 U.S. 423, 429, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987);  *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981);  *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977);  *Lindsey v. Washington,* 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1937);  *Rooney v. North Dakota,* 196 U.S. 319, 324-25, 25 S.Ct. 264, 49 L.Ed. 494 (1905);  *In re Medley,* 134 U.S. 160, 171, 10 S.Ct. 384, 33 L.Ed. 835 (1890);  *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 325-26, 18 L.Ed. 356 (1866);  *Calder v. Bull,* 3 U.S. (Dall.) 386, 390, 1 L.Ed. 648 (1798).

[3]First, the law must be "retrospective, that is, it must apply to events occurring before its enactment...."  *Weaver,* 450 U.S. at 29, 101 S.Ct. 960.  Second, the law must "disadvantage the offender affected by it."  *Id.* (quoted in *Akins,* 922 F.2d at 1563).

found both that the Georgia regulation was retroactive and that, by creating significant delays between parole reconsideration hearings, the application of the regulation "substantially disadvantages a prisoner." *Akins,* 922 F.2d at 1564.[4]

*California Dep't of Corrections v. Morales* and *Lynce v. Mathis*

Four years later, the Supreme Court entertained an ex post facto challenge to retroactive application of an amended California Department of Corrections regulation governing parole eligibility. *See California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). At the time that Morales committed the crime for which he was incarcerated, the California parole consideration regulations specified that, once an inmate became eligible for an initial parole consideration hearing, if the inmate was denied parole at that time, he or she would be eligible for annual reconsideration. *See id.* at 503, 115 S.Ct. 1597. Subsequent to Morales' sentencing, however, the California legislature amended the regulation to authorize the Board of Prison Terms "to defer subsequent suitability hearings for up to three years if the prisoner has been convicted of "more than one offense which involves the taking of a life' and if the Board "finds that it is not reasonable to expect that parole would be granted at a hearing during the following [two] years and states the bases for the findings.' " *Id.* (quoting Cal.Penal Code Ann. § 3041.5(b)(2)(West 1982)).

In *Morales,* the Supreme Court rejected an expansive reading of the Ex Post Facto Clause

---

[4]In *Akins,* we addressed three preliminary questions as a predicate to making the ultimate ex post facto determination. Specifically, we found that: (1) Georgia's administrative regulation governing parole reconsideration is a "law" for purposes of the Ex Post Facto Clause, *see Akins,* 922 F.2d at 1561; (2) that a parole reconsideration hearing is part of a prisoner's parole eligibility, *id.* at 1561-62; and (3) that, because parole eligibility is part of an offender's punishment, "for ex post facto purposes, parole eligibility must be considered part of any sentence." *Id.* at 1563. None of these holdings has been called into question either by the Supreme Court's decision in *Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995), or by the parties on appeal.

as forbidding any and all legislative change having any conceivable risk of affecting a prisoner's punishment. *See id.* at 508, 115 S.Ct. 1597. Instead, the Court found it to be "a matter of "degree' " as to which "legislative adjustments "will be held to be of sufficient moment to transgress the constitutional prohibition [on ex post facto laws].' " *Id.* at 509, 115 S.Ct. 1597 (quoting *Beazell v. Ohio,* 269 U.S. 167, 171, 46 S.Ct. 68, 70 L.Ed. 216 (1925)). Declining to provide a universal formula for identifying legislative changes that violate the ex post facto prohibition, *id.,* the Court directed that each case be analyzed by asking "whether [the law at issue] produces a sufficient risk of increasing the measure of punishment attached to the covered crimes," *id.,* and proceeded to apply this standard to the California statute at issue in *Morales.*

First, the Court noted that the regulation as amended applies "only to a class of prisoners for whom the likelihood of release on parole is quite remote": those prisoners "who have been convicted of "more than one offense which involves the taking of a life.' " *Id.* at 510, 115 S.Ct. 1597 (quoting Cal.Penal Code Ann. § 3041.5(b)(2)(West 1982)).

Second, the Court found that the California amendment was intended only "as a means "to relieve the [state's Board of Prison Terms] from the costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released,' " *id.* at 511, 115 S.Ct. 1597 (quoting *In re Lawrence A. Jackson,* 39 Cal.3d 464, 473, 216 Cal.Rptr. 760, 703 P.2d 100 (1985) (quoting legislative history))—and not to increase the punishment of the affected offenders. The Court found the measure to be "carefully tailored" to the end of saving time and money, *id.,* and to incorporate several safeguards to ensure that its application does not result in extending the sentence of a prisoner who would be eligible for parole in the intervening two years. *See id.* Specifically, the Court noted that "the amendment has no effect on any prisoner unless the Board has first concluded, after a hearing, not only that the prisoner is unsuitable for parole, but also that

"it is not reasonable to expect that parole would be granted at a hearing during the following years.' " *Id.* at 511, 115 S.Ct. 1597 (quoting § 3041.5(b)(2)). In this regard, the Court particularly emphasized the statutory requirement that "the [California Board of Prison Terms] must conduct "a full hearing and review' of all relevant facts, and state the bases for its finding." *Id.* (quoting § 3041.5(b)(2)).[5]

Finally, the *Morales* Court noted that, under the amended regulation, the California Board of Prison Terms retains "the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner." *Id.; see also id.* ("The default is an annual hearing but the Board may defer the next hearing up to two years more depending on the circumstances.") (citing § 3041.5(b)(2)). In particular, the Court found no reason to fear that a prisoner who would have been found qualified for release one or two years previous would suffer a later actual release date than he would have under the old annual review system. The Court noted that in California, it is often the case that an inmate's actual release date will come several years after a finding of suitability by the Board. *See id.* at 513, 115 S.Ct. 1597. It therefore reasoned that, because the Board retained the discretion to expedite the release date of an inmate who is able to demonstrate "that he was "suitable' for parole two years prior to such a finding by the Board," such an inmate "might well be entitled to secure a release date that reflects that fact." *Id.*

On the basis of the safeguards in place in the amended California regulation, the *Morales* Court concluded that the regulation as amended "creates only the most speculative and attenuated risk of increasing the measure of punishment attached to the covered crimes." *Id.* at 514, 115 S.Ct.

---

[5]The Court added that "[t]hough California law is not entirely clear on this point, the reliability of the Board's determination may also be enhanced by the possibility of an administrative appeal." *Morales,* 514 U.S. at 511, 115 S.Ct. 1597 (citing Tit. 15 Cal.Code of Regulations, § 2050 (1994)).

1597. As the Court put it,

> [i]n light of the particularized findings required under the amendment and the broad discretion given to the Board, the narrow class of prisoners covered by the amendment cannot reasonably expect that their prospects for early release on parole would be enhanced by the opportunity of annual hearings. For these prisoners, the amendment simply allows the Board to avoid the futility of going through the motions of reannouncing its denial of parole suitability on a yearly basis.

*Id.* at 512, 115 S.Ct. 1597. The Court therefore found no ex post facto violation. *See id.* at 514, 115 S.Ct. 1597.

Subsequently, in *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), the Supreme Court found Florida's attempt to cancel retroactively the accumulated overcrowding credits awarded to inmates convicted of murder and attempted murder to be a violation of the prohibition on ex post facto laws, and in the course of so doing, provided some guidance to courts applying the standards established in *Morales.* The *Lynce* Court emphasized in particular two features of the Court's reasoning in that case. First, it underscored that the "bulk of [the Court's analysis in *Morales* ] focused on the effect of the law on the inmate's sentence" and that the holding in *Morales* "rested squarely on the conclusion that "a prisoner's ultimate date of release would be entirely unaffected by the change in the timing of suitability hearings.' " *Lynce,* at ----, 117 S.Ct. at 897 (quoting *Morales,* 514 U.S. at 513, 115 S.Ct. 1597); *see also id.* at ---- n. 16, 117 S.Ct. at 898 n. 16 ("Simply put, we rejected the inmate's claim in *Morales,* because it could not be said with any certainty that the amended statutory scheme was more "onerous' than at the time of the crime.").

Second, the *Lynce* Court emphasized the need to assess the legislature's purpose behind the change in the sentencing scheme as well as the possible effect of the change on offenders' sentences. In *Lynce,* the Court pointed out that *Morales* never addressed the question as to whether a legislative purpose to "increas[e] the quantum of punishment" would alone "be a sufficient basis for concluding that a law violated the Ex Post Facto Clause when it actually had no such effect." *Id.* at ----, 117

S.Ct. at 897. However, the Court underscored that in *Morales,* where no ex post facto violation was found, "the change at issue had neither the purpose nor the effect of increasing the quantum of punishment." *Id.* In *Lynce,* on the other hand, the Court saw no evidence that the Florida legislature effected the change at issue in that case "merely to save time or money" in those cases in which the ultimate date of release would remain entirely unaffected. Rather, the Court found "it [to be] quite obvious that the retrospective change was intended to prevent the early release of prisoners convicted of murder-related offenses who had accumulated overcrowding credits," *Lynce,* 519 U.S. at ---- - ----, 117 S.Ct. at 897-98. This finding supported the Court's conclusion that the Florida provision violated the prohibition on ex post facto laws.

 The Amended Georgia Regulation

As *Morales* and *Lynce* make clear, our inquiry regarding the retroactive application of Georgia's regulation governing parole reconsideration, r. 475-3-.05.(2), must focus on its effect on " "a prisoner's ultimate date of release,' " *id.* at ----, 117 S.Ct. at 897 (quoting *Morales,* 514 U.S. at 513, 115 S.Ct. 1597), in order to determine whether the change constitutes a "sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* at ---- n. 14, 117 S.Ct. at 897 n. 14 (quoting *Morales,* 514 U.S. at 509, 115 S.Ct. 1597). To determine whether the retroactive application of the Georgia regulation gives rise to such a risk, we examine the regulation in light of the factors discussed in *Morales,* and find it to be wholly distinguishable from the statute at issue in that case.

First, unlike the California statute, it cannot be said of Georgia's r. 475-3-.05.(2) that it applies "only to a class of prisoners for whom the likelihood of release on parole is quite remote." *Morales,* 514 U.S. at 510, 115 S.Ct. 1597. The California statute at issue in *Morales* applied only to those inmates "who have been convicted of "more than one offense which involves the taking of

a life.' " *Id.* (quoting Cal.Penal Code Ann. § 3041.5(b)(2)(West 1982)). The set of affected inmates is thus likely to be extremely small. The Georgia provision, in contrast, applies to all "those inmates serving life sentences," r. 475-3-.05.(2). In Georgia, it turns out, this group can include prisoners convicted of murder, *see* GA.CODE ANN. § 16-5-1; felony murder, *see id.;* rape, *see* GA.CODE ANN. § 16-6-1; armed robbery, *see* GA.CODE ANN. § 16-8-41; kidnapping for ransom, *see* GA.CODE ANN. § 16-5-40; hijacking an aircraft, *see* GA.CODE ANN. § 16-5-44; more than one count of child molestation, *see* GA.CODE ANN. § 16-6-4; perjury that was the cause of someone else being sentenced to death, *see* GA.CODE ANN. § 16-10-70; more than one count of possession or use of a machine gun, sawed-off rifle, sawed-off shotgun, or a firearm equipped with a silencer during the commission or attempted commission of a series of enumerated offenses,[6] *see* GA.CODE ANN. § 16-

---

[6]This list includes:

(1) Aggravated assault as defined in Code Section 16-5-21;

(2) Aggravated battery as defined in Code Section 16-5-24;

(3) Robbery as defined in Code Section 16-8-40;

(4) Armed robbery as defined in Code Section 16-8-41;

(5) Murder or felony murder as defined in Code Section 16-5-1;

(6) Voluntary manslaughter as defined in Code Section 16-5-2;

(7) Involuntary manslaughter as defined in Code Section 16-5-3;

(8) Sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances in violation of any provision of Article 2 of Chapter 13 of [Title 16], the "Georgia Controlled Substances Act";

(9) Terroristic threats or acts as defined in Code Section 16-11-37;

(10) Arson as defined in Code Sections 16-7-60, 16-7-61, and 16-7-62;

(11) Influencing witnesses as defined in Code Section 16-10-93; and

11-160; and more than one count of a series of prohibitions on the manufacture, possession, sale, or distribution of certain controlled substances, *see* GA.CODE ANN. § 16-13-30. The set of inmates whose parole consideration will be affected by r. 475-3-.05.(2) is thus bound to be far more sizeable than the set of inmates affected by the California provision at issue in *Morales.* This set must also—unless we are to believe that the state of Georgia imposes a sentence of life in prison without parole for the entire set of offenses just enumerated—be comprised of many inmates who can expect at some point to be paroled. For this reason, we are unable to conclude that r. 475-3-.05.(2) will apply "only to a class of prisoners for whom the likelihood of release on parole is quite remote."

Second, unlike the California statute, the Georgia regulation cannot be said to be "carefully tailored" so as to support a finding that the measure was intended only to further the legitimate end of saving time and money and not to "increas[e] the quantum of punishment." *Lynce,* 519 U.S. at ----, 117 S.Ct. at 897. The *Morales* Court emphasized that safeguards built into the California provision would ensure that retroactive application would not extend the sentences of those prisoners who would be otherwise eligible for parole in the years between hearings. In particular, the Court noted the statutory requirement that "the [California Board of Prison Terms] must conduct "a full hearing and review' of all relevant facts, and state the bases for its finding" that " "it is not reasonable to expect that parole would be granted at a hearing during the following [two] years.' " *Morales,* 514 U.S. at 511, 115 S.Ct. 1597 (quoting Cal.Penal Code Ann. § 3041.5(b)(2)(West 1982)).

The same cannot be said for the Georgia regulation. It reads, in its entirety,

Reconsideration of those inmates serving life sentences who have been denied parole shall

_____

(12) Participation in criminal gang activity as defined in Code Section 16-15-4. GA.CODE ANN. § 16-11-160.

take place at least every eight years. The Board will inform inmates denied parole of the reasons for such denial without disclosing confidential sources of information or possible discouraging diagnostic opinions.

Ga. Comp. R. & Regs. r. 475-3-.05.(2). The Board is not required to make any particularized findings supporting its conclusion that, as to the inmate under consideration, "it is not reasonable to expect that parole would be granted" during the intervening eight years before the next hearing—indeed, as the facts of this case indicate, the Board would be within its discretion to say next to nothing.[7] Nor is the Board required to have any sort of hearing on this question, much less the "full hearing" required by the California statute approved by the Supreme Court in *Morales*.

Unlike the California provision at issue in *Morales,* which established an annual hearing as a default but conferred on the Board of Prison Terms the authority to "defer the next hearing up to two years more depending on the circumstances," the Georgia regulation simply sets the default for affected inmates at reconsideration "at least every eight years." Eight years is a long time. Much can happen in the course of eight years to affect the determination that an inmate would be suitable

---

[7]The letter Jones received from the Board in 1995 illustrates the minimal burden the regulation places on the Board to justify its scheduling decisions. In its entirety, this letter reads:

Dear Mr. Jones,

You have been thoroughly and carefully considered for parole. The Board's decision is to deny parole at this time. The main reasons for the decision cited by the Board members during their individual study of your case are circumstances and nature of the offense, and multiple offenses.

The board has decided to consider you again for parole during August 2003.

Sincerely,

[signature].

R.1-18-Ex.3

for parole. The *Morales* Court emphasized that, because an inmate's "parole release date [often] comes at least several years after a finding of suitability," and because the Board "retains the discretion to expedite the release date of such a prisoner," a prisoner affected by the amended California statute who can demonstrate "that he was "suitable' for parole two years prior to such a finding by the Board might well be entitled to secure a[n earlier] release date that reflects that fact." *Morales,* 514 U.S. at 513, 115 S.Ct. 1597. The eight-year period specified in r. 475-3-.05.(2), however, is simply too long to allow us to say that an inmate who would have been able to demonstrate suitability for parole in the years between reconsideration hearings would be able to "cure" this delay through petitioning for an earlier release date. There is therefore a "sufficient risk" that the amended Georgia regulation would "increas[e] the measure of punishment attached to the covered crimes." *Id.* at 509, 115 S.Ct. 1597.

We are not persuaded by the Board's argument that the policy statement it issued in October 1996 cures the constitutional defects of r. 475-3-.05.(2) identified here. *See* State Board of Pardons and Paroles Policy Statement No. 4.110. The relevant language of the policy statement provides that

> *Policy:* It is the policy of the Board that all Life Sentence Cases denied parole may be set for reconsideration up to a maximum of eight years from the date of the last denial when, in the Board's determination, it is not reasonable to expect that parole would be granted during the intervening years. Inmates set-off under this policy may receive expedited parole reviews in the event of a change in their circumstance or where the Board receives new information that would warrant a sooner review.
>
> *Procedures:* At the time the Members vote to deny parole in a Life Sentence Case, the Members will indicate the number of years the inmate must serve prior to being next considered.

*See id.* §§ 1.105-06.

This policy does not sufficiently mitigate the defects in the regulation itself to defeat an ex post facto challenge. Policy statements, unlike regulations, are unenforceable and easily changed, and adherence to them is a matter of the Board's discretion. These are qualities that caution against

treating their contents as if they had the authority of officially promulgated statutes or regulations. Moreover, even notwithstanding these limitations, this particular policy statement still does not require the Board to make particularized findings or even to provide clear reasons for its decision regarding the scheduling of subsequent hearings. And it also, of course, continues to allow an interval of eight years between hearings without any requirement that the Board consider an inmate's case during that time. Given the large class of affected inmates, this eight-year interval seems certain to ensure that some number of inmates will find the length of their incarceration extended in violation of the Ex Post Facto Clause of the Constitution.

The Board also argues that we should follow the Fourth Circuit, which in the wake of *Morales* upheld against ex post facto challenges the retroactive application of both South Carolina's and Virginia's amended parole reconsideration statutes. *See Roller v. Gunn,* 107 F.3d 227 (4th Cir.1997) (South Carolina); *Hill v. Jackson,* 64 F.3d 163, 169-70 (4th Cir.1995) (Virginia). We do not find in these cases, however, any discussion or analysis of the absence in the statutes at issue of the procedural safeguards deemed essential in *Morales* to protect inmates against an increase in the "quantum of punishment" attached to their crimes. *See Roller,* 107 F.3d at 238-40 (dissent of Judge Hall). Moreover, the South Carolina statute as amended provides that affected inmates "only have [their] case[s] reviewed every two years after an initial negative parole determination rather than every year," *Roller,* 107 F.3d at 229 (citing S.C.CODE ANN. § 24-21-645 (Law. Co-op.1997)), while the Virginia amendments authorize the extension of the period between parole reconsiderations from one year to three years. *Hill,* 64 F.3d at 166 (citing VA.CODE ANN. § 53.1-154 (Michie 1988)). The respective time-frames created for the subsequent parole reconsideration of inmates by the South Carolina and Virginia statutes are thus considerably shorter than the lengthy eight-year gap between parole reconsiderations authorized by the Georgia provision, thus creating

less of a risk than the Georgia statute that "the measure of punishment" imposed on affected inmates will be "increased." *Morales,* 514 U.S. at 513, 115 S.Ct. 1597.

Whether a particular provision violates the prohibition on ex post facto laws is a "matter of "degree.'" *Morales,* 514 U.S. at 509, 115 S.Ct. 1597 (quoting *Beazell,* 269 U.S. at 171, 46 S.Ct. 68). Given the length of time that the Georgia provision requires inmates to wait between parole consideration hearings and the absence of safeguards such as a "full hearing and review of all the relevant facts" and an obligation on the part of the Board to state particularized facts relating to the inmate's likely future parole eligibility, we cannot conclude—as we must, to find no ex post facto violation—that the amended regulation "ha[s] neither the purpose nor the effect of increasing the quantum of punishment." *Lynce,* 519 U.S. at ----, 117 S.Ct. at 897.

For the foregoing reasons, we conclude that *Akins* has not been overruled. Indeed, we find that the Supreme Court's reasoning in *Morales* and *Lynce* reaffirms the correctness of our holding in that case. Thus, pursuant to *Morales, Lynce,* and *Akins,* we REVERSE the district court's grant of the defendant's motion for summary judgment on the plaintiff's ex post facto claim, and REMAND the case to the district court for proceedings consistent herewith.